UNITED STATES of America, Appellee,

v.

James Vincent ALBERTINI, Appellant.

No. 82–1090.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 22, 1982.

Decided July 22, 1983.

William A. Harrison, Yvonne E. Chotzen, American Civil Liberties Union of Hawaii, Honolulu, Hawaii, for appellant.

H. Ray Starling, U.S. Atty., Hickman AFB, Hawaii, for appellee.

Before CANBY, NORRIS and REINHARDT, Circuit Judges.

CANBY, Circuit Judge:

Defendant James Vincent Albertini appeals from his conviction under 18 U.S.C. § 1382 (1976) for illegal reentry onto a military base. Albertini reentered Hickam Air Force Base during an "open house" to distribute anti-war pamphlets. He contends that this activity was protected by the first amendment. We agree, and we reverse the conviction.

### FACTS

On May 16, 1981, Hickam Air Force Base held its annual "Armed Forces Day Joint Service Open House." The official theme of the open house was "U.S. Armed Forces—Strong and Ready." The Air Force promoted the event for several weeks with radio and newspaper advertisements. One news release described the occasion:

#### HICKAM HOSTS JOINT SERVICE OPEN HOUSE

Hickam Air Force Base, Hawaii (April 16, 1981)—The 32nd Annual Armed Forces Day Open House will be held here Saturday May 16 from 9 a.m. to 4 p.m. The theme this year is the "U.S. Armed Forces—Strong and Ready."

Top local, country and western, and military entertainment—provided by the Royal Hawaiian Band, the Aloha Airlines Musical/Hula Troupe, J.T. and the Rowdy Band, Dave West and the Chaingang, Chris Cassidy and the Rainbow Connection, the Skylarks and the Fleet Marine Force Pacific Band—will perform during the open house.

More than 30 aircraft from the U.S. Army, Navy, Air Force, Marine Corps, Coast Guard, Hawaii Army and Air National Guard, Civil Air Patrol and the Wheeler Aero Club will be on display throughout the day.

Parachute jumps by the Navy and the Marine Corps, Marine troops rappelling from helicopters, aircraft flyovers by the Hawaii Air National Guard, Air Force and the Navy are also scheduled.

Additionally, a crash/rescue demonstration by the Hickam Fire Department, a helicopter rescue demonstration by the Coast Guard and several police dog demonstrations by the Hickam Security Police will be conducted that day.

Also open that day is the annual Air Force Hawaii Youth Festival. Carnival rides, games and a midway packed with food and drinks will be the main attractions. Air Force nominees, representing the various commands at Hickam, will compete for the crown of Youth Festival Queen. The crowning ceremony will take place Friday evening at 6 p.m.

Hickam, normally a closed base, will be open to the public for the Armed Forces Day Open House.

A radio "beeper" added: "Hickam's Main Gate opens at 9:00, the public is invited and it's all free!" During the open house, some parts of the base, where the normal military activities of the installation were carried on, remained closed, fenced off, and guarded.

Thousands of people entered the base on May 16 to see the displays and partake of the festivities. Included among them were James Albertini and four companions who came to protest the arms race. They gathered in the shadow of the B–52 bomber display, and unfurled a banner: "Carnival

of Death." Albertini walked about, taking pictures and passing out leaflets protesting nuclear war and the proliferation of nuclear weapons. At all times, these activities were peaceful, and were confined to the area set aside for the open house.

Military Police rounded the protestors up and escorted them off the base. Albertini had previously received a "bar letter" forbidding him to reenter Hickam without the express permission of the commander.[1] He was charged therefore under 18 U.S.C. § 1382 with reentering a military installation after having been ordered not to reenter.[2] He was convicted in United States District Court.

## DISCUSSION

Albertini contends: 1) that the open house advertisements constituted written permission for him to reenter, 2) that his actions were a constitutionally protected exercise of free speech, and 3) that the conviction on the basis of a nine year old bar letter violated due process. We reject the contention that newspaper advertisements inviting the general public fulfilled the "written permission" requirement of the bar letter. We do, however, uphold Albertini's first amendment defense. Because of our resolution of the free speech issue, we need not consider Albertini's due process contentions.

Albertini's first amendment argument rests upon the assertion that on Armed Forces Day Hickam was a "public forum" where the right to leaflet could not be unreasonably circumscribed. We face a two part inquiry here: first, whether Hick-am constituted a public forum; second, whether the military could exclude him from a public forum located on a military base.

## I. The Public Forum

Certain public places, appropriate for assembly and communication, enjoy special constitutional status as "public forums." *See generally,* L. Tribe, *American Constitutional Law,* 688–93 (1978). In a public forum, the first amendment narrowly circumscribes the government's power to exclude or regulate speech. As public places differ, however, so does the expression appropriate to them, and hence the scope of protection provided by the first amendment. Traditional settings for civic debate—streets, parks, sidewalks—always constitute public forums and receive the greatest protection. *Cary v. Brown,* 447 U.S. 455, 461, 100 S.Ct. 2286, 2290, 65 L.Ed.2d 263 (1980). Public property may also become a public forum if the state opens it for public use as a place for expressive activity. Expression then receives the same protection as in traditional forums. *Widmar v. Vincent,* 454 U.S. 263, 272–74, 102 S.Ct. 269, 275–276, 70 L.Ed.2d 440 (1981). Finally, the state may establish a "limited public forum" in which public expression is limited to certain groups or confined to particular subject matter. *Perry Education Ass'n v. Perry Local Educators' Ass'n,* —— U.S. ——, ——, 103 S.Ct. 948, 955 n. 7, 74 L.Ed.2d 794 (1983).

A military base, even one open to the public, is not a traditional public forum. *Greer v. Spock,* 424 U.S. 828, 838, 96 S.Ct.

---

1. On March 2, 1972, Albertini and a companion entered Hickam, ostensibly to present letters to the commander. The pair made their way into an office, and Albertini's companion poured animal blood on some secret documents found there. Both men were convicted of conspiracy to destroy government records in violation of 18 U.S.C. §§ 2, 371, & 1361. Albertini served 90 days and paid a fine of $250. He also received a bar letter forbidding him to "reenter the confines of this installation without the written permission of the Commander or an officer designated by him to issue a permit of reentry."

2. 18 U.S.C. § 1382 provides:

Whoever, within the jurisdiction of the United States, goes upon any military, naval, or Coast Guard reservation, post, fort, arsenal, yard, station, or installation, for any purpose prohibited by law or lawful regulation; or Whoever reenters or is found within any such reservation, post, fort, arsenal, yard, station, or installation, after having been removed therefrom or ordered not to reenter by any officer or person in command or charge thereof—Shall be fined not more than $500 or imprisoned not more than six months, or both.

1211, 1217, 47 L.Ed.2d 505 (1976); *United States v. Douglass,* 579 F.2d 545, 549 (9th Cir.1978). Albertini contends, however, that Hickam on Armed Forces Day constituted a public forum, either one where all expression was permitted, or at least one where Albertini was permitted to counter the Air Force's own implicit message on defense policy.

■ We first consider whether the Air Force created a public forum by opening Hickam to the public for purposes related to expression. If the government creates such a forum, even though under no duty to do so, its power to exclude expression is severely limited. "Reasonable time, place and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest." *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 103 S.Ct. at 955. Although the government is not required to maintain indefinitely the open character of the facility, "as long as it does so it is bound by the same standards as apply in a traditional public forum." *Id.*

■ Merely permitting public access to property other than streets or parks, however, does not open the facility for use as a public forum. *Greer v. Spock,* 424 U.S. at 836, 96 S.Ct. at 1216. The place or its intended use must somehow render the facility appropriate for expression. For example, a public meeting for discussion of a pending teachers' contract clearly created a public forum (albeit a limited one) in the school property where it was held. *City of Madison Joint School District v. Wisconsin Public Employment Relations Commission,* 429 U.S. 167, 174–76, 97 S.Ct. 421, 425–426, 50 L.Ed.2d 376 (1976). A public forum may also be created when the use is less directly related to public debate. In *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975), a theater under lease to the City of Chattanooga was found to be a public forum. Presenting plays and shows was sufficiently related to

public expression that the city could not arbitrarily exclude the musical "Hair." *Id.* at 555, 95 S.Ct. at 1245. In *Heffron v. International Society for Krishna Consciousness,* 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981), the Supreme Court assumed without discussion that the Minnesota State Fair constituted a public forum. *Id.* at 651, 655, 101 S.Ct. at 2565–2566, 2567. The fair was intended to showcase "the agricultural, stock-breeding, horticultural, mining, mechanical, industrial, and other products and resources of the state, including proper exhibits and expositions of the arts, human skills and sciences." *Id.* at 643, 101 S.Ct. at 2561. Although the fair was not literally set aside for debate of public issues, it still was an appropriate place for expression and constituted a public forum. The state could not ban all expressive activity, although it could impose reasonable time, place and manner restrictions—such as restricting solicitation to booths. *Id.* at 655 n. 16, 101 S.Ct. at 2568 n. 16.

While these analogies are instructive, they do not deal with military bases. The government contends that the controlling decision in that regard is *Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976), which established that a military base is not ordinarily a public forum and held that partisan political expression could be excluded from it. Several factors distinguish *Greer* from this case, however. In *Greer,* the military facility in question was Fort Dix, which was located in a rural area and was devoted primarily to basic training. The proposed expression was face-to-face solicitation of trainees on the premises of Fort Dix. While most of Fort Dix was open to the public, military police patrolled all areas and the Army had not abandoned any claim of control over political speech on the facility. The commander could therefore exclude political speech "to avert what he perceive[d] to be a clear danger to the loyalty, discipline, or morale of troops on the base under his command." 424 U.S. at 840, 96 S.Ct. at 1218. The prohibition was consistent with the traditional neutrality of

the military in political affairs. *Id.* at 839, 96 S.Ct. at 1218.

In the present case, however, the Air Force by its publicity campaign opened up its facility to a far greater variety of activity and expression than had occurred at Fort Dix. The situation is more comparable to that in *Flower v. United States,* 407 U.S. 197, 92 S.Ct. 1842, 32 L.Ed.2d 653 (1972) (per curiam), a case that was distinguished but not overruled in *Greer,* 424 U.S. at 837, 96 S.Ct. at 1217. *Flower* involved leafleting on New Braunfels Avenue, a street on Fort Sam Houston that was a major San Antonio traffic artery. Access was unguarded and 15,000 vehicles per day passed by. The Court held that under "such circumstances the military has abandoned any claim that it has special interests in who walks, talks, or distributes leaflets on the avenue." 407 U.S. at 198, 92 S.Ct. at 1843.[3]

■ We believe that, like New Braunfels Avenue, the open portions of Hickam Air Force Base on Armed Forces Day were areas over which the military had effectively abandoned control of access. Indeed, the scene was perhaps closest in character to the state fairgrounds in *Heffron,* and partook of its nature as a public forum. The Air Force did much more than merely permit visitors on the base. Armed Forces Day was created especially for public participation. The Air Force went to considerable effort to publicize the event and attract visitors. Radio and newspaper advertisements highlighted the attractions of aircraft displays and demonstrations, carnival rides, bands, concessions, and a beauty pageant. If the Air Force had intended to make Hickam into a public park or fairgrounds for a day, it could have done little more. Further, the Air Force admitted in argument that one of the purposes of the

activities was to present the military's view in the current arms debate, to show the public that its money is being used efficiently, that the forces are "strong and ready." The base was, temporarily, a focus of public attention concerning the role of the military in American policy. For these reasons we hold that Hickam Air Force Base was temporarily opened to the public for purposes inextricably associated with and appropriate for expression. The base therefore constituted a public forum for the duration of the day's festivities.

■ There are additional factors that remove this case from the rule of *Greer,* however. By far the most important is the fact that Albertini's expression, like that of the Air Force, was directed primarily toward the non-military public. There was accordingly a negligible threat to "the loyalty, discipline, or morale of troops," which was an important consideration in *Greer.* Nor was Hickam a specialized facility for the basic training of recruits in relative isolation; any distraction provided by Armed Forces Day was of the military's own making.

■ Moreover, Albertini's demonstration posed no threat to the military's traditional noninvolvement in political debates. As the government conceded at argument, part of the purpose of Armed Forces Day was to convey a message to the civilian guests—that of the country's need for a "strong and ready" armed force, and the efficiency with which the Air Force fills that role. This implicit communication is not a partisan political message in the normal sense, yet undeniably it is a form of speech concerning an issue of considerable public interest today. Of course, the Air Force has every right to present this mes-

---

**3.** Hickam may also be analogized to a public school classroom that has been temporarily converted into a public meeting room for the school board. Under those circumstances, it seems clear that outsiders wishing to express their views on school policy would have a first amendment right to do so. *See City of Madi-* *son Joint School District v. Wisconsin Public Employment Relations Commission,* 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976). They would not have a right to do so while the schoolroom is being used for its usual educational purposes, a situation more comparable to that in *Greer.*

sage in this way. Where the military initiates communication on a subject, however, it cannot reasonably argue that a reply will destroy the military's traditional neutrality.

■ Indeed, the communicative purpose of the Air Force's open house greatly strengthens Albertini's claim to access. For even if, contrary to our view, the Air Force did not create a full-fledged public forum at Hickam on Armed Forces Day, it created at the minimum a "limited public forum." "A public forum may be created for a limited purpose such as use by certain groups, *e.g.*, *Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (student groups), or for the discussion of certain subjects, *e.g.*, *City of Madison Joint School District v. Wisconsin Public Employment Relations Comm'n*, 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976) (school board business)." *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 103 S.Ct. at 955 n. 7. The Air Force, in utilizing the Armed Forces Day open house to disseminate to the public its message that defense appropriations were being wisely used, clearly established that subject matter as an appropriate one for debate. If Hickam's open house constituted only a limited public forum, Albertini's peaceful protest against the arms race was clearly within the designated subject matter. *See Madison Joint School District v. Wisconsin Public Employment Relations Comm'n,* 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976) (school board meeting is limited public forum for school board business). And it is wholly within the purposes of the first amendment that his side of the question be presented.

■ Finally, the Air Force had no legitimate belief that Albertini was disrupting the Armed Forces Day activities. Normal military routine was already set in abeyance by the necessity of accommodating tens of thousands of visitors and hosting the activities of Armed Forces Day. There, amidst the aerial weapons and combat displays, the carnival rides and music and hot

dog stands, Albertini quietly handed out his leaflets. We can imagine few means of expression more basic to the spirit of the first amendment and less disruptive to the Hickam open house. We are therefore compelled to conclude that Albertini's manner of expression was not basically incompatible with activity of Hickam at that particular time. *See Grayned v. City of Rockford,* 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972).

The government relies heavily on *Persons for Free Speech at SAC v. U.S. Air Force,* 675 F.2d 1010 (8th Cir.) (en banc), *cert. denied,* —— U.S. ——, 103 S.Ct. 579, 74 L.Ed.2d 939 (1982), which held under very similar facts that Offutt Airbase was not a public forum. In *SAC,* the majority noted that military bases have not traditionally served as places for public expression. 675 F.2d at 1015. The court then stated:

As noted by the district court, there is no case law which supports the concept of a "temporary public forum." The Supreme Court has rested its "public forum" analysis on considerations of the historical and traditional uses of the relevant government property. [citations omitted] The question, therefore, is whether the open house is such a deviation from the historical and traditional uses of OAFB so as to create a public forum.

*Id.* Determining that the open house supported the military mission by improving community relations, the court concluded the open house was a traditional use that created no public forum. *Id.* at 1016–17.

With respect, we are unable to accept this analysis. The *SAC* majority addressed only the first part of the public forum doctrine: traditional use. The opinion failed to consider whether the military created a forum by temporarily opening its property to public expression. As we have seen, contrary to the assertion in *SAC,* a substantial body of case law supports the concept of a "temporary public forum." *See Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d

440 (1981); *Heffron v. International Society for Krishna Consciousness,* 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981); *City of Madison Joint School District of Wisconsin Public Employment Relations Commission,* 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976); *Southeastern Promotions Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975); *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). By focusing solely on whether the open house "supported the military mission" the *SAC* majority failed to address the special circumstances of the occasion and to confront the issues we find to be dispositive. We accordingly agree with the *SAC* dissent.

██ We conclude that members of the public had a first amendment right to hold signs and pass out leaflets at Hickam Field on Armed Forces Day. The Air Force has made no showing that the exclusion of Albertini was a reasonable time, place and manner restriction. This determination does not, however, end our inquiry: we must still consider whether the military can exclude holders of bar letters from a public forum on a military base.

II. The Bar Letter

██ In the interests of security, the military unquestionably has broad power to exclude persons from sensitive areas. *See Greer v. Spock,* 424 U.S. at 838, 96 S.Ct. at 1217; *Cafeteria Workers v. McElroy,* 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); *United States v. May,* 622 F.2d 1000, 1006 (9th Cir.), *cert. denied sub nom. Phipps v. United States,* 449 U.S. 984, 101 S.Ct. 402, 66 L.Ed.2d 247 (1980). Several decisions of the Supreme Court and of this court imply, however, that the military loses its power to exclude when a base becomes a public forum. In *Flower v. United States,* 407 U.S. 197, 92 S.Ct. 1842, 32 L.Ed.2d 653 (1972), the Supreme Court reversed a conviction for distributing leaflets on the public forum of New Braunfels Avenue in Fort Sam Houston. The Court stated that the "base commandant can no more

order petitioner off this street because he was distributing leaflets than could the city police order any leafleteer off any public street." *Id.* at 198, 92 S.Ct. at 1843. Flower had been given a previous bar order, and the prosecution was for illegal reentry in violation of 18 U.S.C. § 1382. *Flower* therefore controls this case. Similarly, in *United States v. Douglass,* 579 F.2d 545 (9th Cir.1978), before affirming the conviction of a bar letter holder who reentered a base, we determined that a base was not a public forum. *Id.* at 549. Clearly this step in the analysis would have been unnecessary if the military could exclude bar letter holders from a public forum. Moreover, such selective exclusion runs counter to the very notion of the public forum as a place open to all who would express their views.

We do not by our ruling deprive the military authorities of all power to exclude individuals from military installations whenever access is offered to other members of the public. Our decision is grounded in the nature of the activities at Hickam Air Force Base on the day in question, and their effect in rendering the open portions of the facility a public forum. Nor do we deal here with the exclusion of an individual whose presence constitutes a threat to the security of the military operation. The sensitive areas of Hickam were cordoned off and protected by guards. Albertini did not intrude there. His removal and the enforcement of his bar letter were precipitated solely by his peaceful expressive activity.

We conclude that Albertini's actions on Armed Forces Day were constitutionally protected. Because of our resolution of the free speech issue we need not consider Albertini's due process arguments. The conviction is REVERSED.