[No. AO13062. First Dist., Div. Three. Apr. 27, 1984.]

U.C. NUCLEAR WEAPONS LABS CONVERSION PROJECT et al.,
Plaintiffs and Respondents, v.
LAWRENCE LIVERMORE LABORATORY et al.,
Defendants and Appellants.

1158

**COUNSEL**

Donald L. Reidhaar, Glenn R. Woods, Gary Morrison and Melvin W. Beal for Defendants and Appellants.

Mitchell Zimmerman, Fenwick, Stone, Davis & West, Margaret C. Crosby, Alan L. Schlosser, Amitai Schwartz, Joseph Remcho, Rosen and Remcho, Remcho & Johansen and Remcho, Johansen & Purcell for Plaintiffs and Respondents.

**OPINION**

**WHITE, P. J.—**

*Introduction*

This is an appeal by the Lawrence Livermore Laboratory and certain officials of the Laboratory and of the University of California, from an order granting a preliminary injunction which requires the Laboratory to allow the U.C. Nuclear Weapons Labs Conversion Project to use the Laboratory's Visitors Center to display literature and show slideshows, and to apply to use a certain auditorium to present programs.

The question on review of an order granting a preliminary injunction is whether the trial court abused its discretion. (*Continental Baking Co.* v. *Katz* (1968) 68 Cal.2d 512, 527 [67 Cal.Rptr. 761, 439 P.2d 889]; *City of Torrance* v. *Transitional Living Centers for Los Angeles, Inc.* (1982) 30 Cal.3d 516, 519 [179 Cal.Rptr. 907, 638 P.2d 1304].)

Since a preliminary injunction is a provisional remedy (see Code Civ. Proc., §§ 526, 527), its granting or denial cannot be based on a final determination of the merits of the case. (*Continental Baking Co.* v. *Katz, supra,* 68 Cal.2d at p. 528.) Rather, the trial court is required to weigh the harm to the plaintiff which would probably result from denying the preliminary injunction, as against the harm to defendant which would probably result from its granting. (*Ibid.*) And a necessary consideration in this balancing process is whether there is a reasonable probability that the plaintiff will succeed on the merits. (*Ibid.*)

In the instant case the trial court decided that the conversion project was likely to succeed ultimately in obtaining a permanent injunction, and that a balancing of equities justified issuance of the preliminary injunction. The question before this court is whether these assessments " 'exceeded the bounds of reason or contravened the uncontradicted evidence.' " (*Id.,* at p. 527, citations omitted.)

We conclude that the trial court's judgment was sound and affirm the order granting a preliminary injunction.

*Background*

Plaintiffs and respondents are the U.C. Nuclear Weapons Labs Conversion Project and three of its members (the Project, Conversion Project, or

respondents). The Project is an unincorporated association which opposes the work of the Lawrence Livermore Laboratory in the area of developing nuclear weapons and nuclear power.

Defendants and appellants are the Lawrence Livermore Laboratory itself (the Laboratory); its director; and the supervisor of its Visitors Center; as well as the president and the Regents of the University of California. The Laboratory is owned by the federal government and run by the University of California under contract with the U.S. Department of Energy. The Laboratory is one of two places in the country where nuclear weapons are developed, and it also does non-weapons-related research.

The conversion project was founded in 1976. It is unclear at exactly what point its activities in the immediate vicinity of the Laboratory began, but the record does show that in 1979 and 1980 the Laboratory allowed Project members to distribute literature near two cafeterias during three different time periods. In May 1979, the Project held a "rally and conversion fair" on university property adjoining the Laboratory site, with the cooperation of the Laboratory.

In February of 1979 the Project requested permission to place literature and to give periodic slideshows in the Visitors Center at the Laboratory, to which the public has virtually unrestricted access. This request was refused, and the Laboratory offered instead to allow the project to distribute literature in the parking area next to the Visitors Center.

In October 1979 a Project member employed at the Laboratory requested the use of the Building 123 Auditorium (the auditorium) for the presentation of a program by the Project. The auditorium is located within a fenced area of the Laboratory grounds to which the public does not have open access. The request was refused.

On April 10, 1980, the Conversion Project filed a complaint for injunction and declaratory relief, alleging that the Laboratory's refusal to allow the Conversion Project to display materials in the Laboratory's Visitors Center and to use the auditorium constituted a violation of article I, sections 2 and 7 of the California Constitution, and of the First and Fourteenth Amendments of the United States Constitution, and of 42 United States Code section 1983.

On June 10, 1980, a hearing was held on the request for a preliminary injunction. On June 17, 1980, the superior court granted the preliminary

injunction and ordered that respondents were to be granted access to the Building 123 auditorium without regard to their views, opinions, policies or goals, and without the necessity of sponsorship by a Laboratory employee; and that respondents were to be allowed to place literature in the Visitors Center. It also ordered appellants to designate space in the Visitors Center where the Conversion Project could place two 4 feet by 6 feet posters, and to designate two times a month when respondents could use the auditorium-projection room to present a slide show or film.

On June 17, 1980, appellants filed a notice of appeal from the preliminary injunction.

*Discussion*

As discussed above, this is a case which technically involves only the question of whether the trial court's opinion that plaintiffs would probably succeed on the merits was reasonable. Actually, however, this determination cannot be made without an analysis of the relevant law which amounts to a discussion of the merits.

Both parties rely on the same federal cases in reaching dramatically opposite conclusions. This is due largely to divergent approaches based on different philosophies—a schism made possible by what has been described as "generally inchoate first amendment theory. . ." evident in the federal cases. (Note, *The Public Forum: Minimum Access, Equal Access, and the First Amendment* (1975) 28 Stan.L.Rev. 117, fn. omitted.)

Appellants argue essentially that the Laboratory's Visitors Center is not a "public forum" as are streets, sidewalks and parks which have "immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." (*Hague* v. *C.I.O.* (1939) 307 U.S. 496, 515 [83 L.Ed. 1423, 1436, 59 S.Ct. 954].)

In addition, appellants assert that the Visitors Center is not even analogous to streets and parks, as bus and airport terminals and waiting rooms in public assistance offices have been found to be. (*Wolin* v. *Port of New York Authority* (2d Cir. 1968) 392 F.2d 83; *Kuszynski* v. *City of Oakland* (9th Cir. 1973) 479 F.2d 1130; *Albany Welfare Rights Organization* v. *Wyman* (2d Cir. 1974) 493 F.2d 1319; *Unemployed Workers Union* v. *Hackett* (D.R.I. 1971) 332 F.Supp. 1372.) There are two bases for the distinction appellants make: first, that the Visitors Center is not a place where people mingle freely and gather to exchange viewpoints on public

questions, and second, that it is an end destination in itself and the people in it are not on their way to any place else.

Appellants conclude that since *no* groups or individuals outside the Laboratory have been allowed to use the Visitors Center for "the sorts of expressive activities demanded by plaintiffs," the Conversion Project has been treated the same as all other outside groups and has no equal protection claim with regard to it.

Respondents, on the other hand, insist that the label "public forum" cannot be applied mechanically. They argue that the right to engage in expressive activity in a place open to the public must depend on the nature of the proposed expressive activity, and the nature of the particular place. (*Grayned* v. *City of Rockford* (1972) 408 U.S. 104, 116 [33 L.Ed.2d 222, 232, 92 S.Ct. 2294]. See also Shiffrin, *Government Speech* (1980) 27 UCLA L.Rev. 565, 574.) Thus, the central question posed by respondents is not whether the Visitors Center is analogous to a park or street. Rather, it is whether the display of literature and occasional presentation of slideshows by the Project would be basically incompatible with the primary purpose of the Visitors Center.

■   Keeping in mind that the free speech and petitioning provision in the California Constitution does not *mirror* the First Amendment either in form or content (*Robins* v. *Pruneyard Shopping Center* (1979) 23 Cal.3d 899, 910 [153 Cal.Rptr. 854, 592 P.2d 341]), we draw on both provisions for the analysis required in this state.   ■   And as our Supreme Court has observed, for state constitutional analysis "[f]ederal principles are relevant but not conclusive so long as federal rights are protected." (*Id.*, at p. 909.)

The Laboratory is located in California and run by the Regents of the University of California, most of whom are appointed by the Governor or are elected officials. We assume that the vast majority of its employees are California taxpayers and citizens. Certainly any risk of harm which may exist because of the nature of the Laboratory's work (e.g., explosions or other accidents involving radioactive materials) is borne most immediately by residents of surrounding areas. Clearly the policies and decisions about the type of work done at the Laboratory, its relationship to the University, and even its location are of vital significance to the people of this state.

In addition, the right of free speech in this state is a vigorous one, largely because of the obligation and right of our citizens to be actively involved in government through the processes of initiative, referendum and recall which distinguish our state constitutional system. (Cal. Const., art. II, §§ 8,

9, 13.) These mechanisms for direct popular government have been described as "a basic process in the state's constitutional scheme. . . ." (*Robins, supra,* 23 Cal.3d at pp. 907-908.)

It is appropriate in these circumstances to evaluate the free speech claim in the instant case as a matter of state constitutional law.

First, on the dispute over "public forum" analysis, we agree with respondents that this concept is a continuum, with public streets and parks at one end and government institutions like hospitals and prisons at the other. (See *Prisoners Union* v. *Department of Corrections* (1982) 135 Cal.App.3d 930, 935 [185 Cal.Rptr. 634]; see also *United States* v. *Grace* (1983) 461 U.S. 171, 177-181 [75 L.Ed.2d 736, 744-746, 103 S.Ct. 1702, 1707-1708]; *Perry Educ. Assn.* v. *Perry Local Educators' Assn.* (1983) 460 U.S. 37, 45-46 [74 L.Ed.2d 794, 804-805, 103 S.Ct. 948, 954-955]; Tribe, American Constitutional Law (1978) pp. 690-691; *Lehman* v. *City of Shaker Heights* (1974) 418 U.S. 298, 302-304 [41 L.Ed.2d 770, 776-778, 94 S.Ct. 2714] ["open spaces and public places differ. . ."]; *U.S. Southwest Africa/ Namibia Trade and Cultural Council* v. *U.S.A.* (D.C. Cir. 1983) 708 F.2d 760, No. 81-2199, pp. 6-9; *United States* v. *Albertini* (9th Cir. 1983) 710 F.2d 1410; *Taxpayers for Vincent* v. *Members of City Council* (9th Cir. 1982) 682 F.2d 847, 850-851, fn. 3.)

In *Prisoners Union, supra,* 135 Cal.App.3d 930, Presiding Justice Grodin, writing for a unanimous panel, faced this same dispute over the proper analytical approach to free speech/public forum issues. *Prisoners Union* involved a request by an organization concerned with the welfare of prisoners and their families, to set up a card table for the distribution of literature, in the visitors parking lot outside the entrance building to the prison. It reversed the trial court's denial of an injunction.

Justice Grodin's reading of the cases, and his reliance on a California constitutional perspective, led to the same conclusion as this opinion. *Prisoners Union* rejected any "rigid formulation" of the concept of public forum (*id.,* at p. 935) and saw a " 'hierarchy of forums' " in the relevant cases. (*Ibid.,* quoting from *United States* v. *Douglass* (9th Cir. 1978) 579 F.2d 545, 548-549.)

This court has therefore adopted the "basic incompatibility" test. (*Prisoners Union, supra,* 135 Cal.App.3d at p. 936.) *Prisoners Union* also emphasized that "California authorities uphold the right of expression in public places on the basis of principles which are . . . in some respects *more protective* [than the federal]." (*Id.,* at p. 939, italics added.)

The issue in *United States* v. *Grace, supra,* 461 U. S. 171, was the constitutionality of a statute prohibiting the display of flags or banners designed to draw public attention to a party, organization, or movement, in the Supreme Court building or on the surrounding grounds. The court struck down the regulation insofar as it applied to the sidewalks around the courthouse, as an unreasonable "place" regulation. (See concurrence and dissent by Justice Marshall, arguing for a broader holding under a basic incompatibility test, 461 U.S. at pp. 184-189 [75 L.Ed.2d at pp. 748-751, 103 S.Ct. at pp. 1710-1712.)

The court discussed the "public forum" concept, reiterating the principle that "streets, sidewalks and parks . . . are considered, without more, to be 'public forums.'" (*Id.* 461 U.S. at p. 177 [75 L.Ed.2d at p. 743, 103 S.Ct. at pp. 1706-1707].) It also mentioned that whether other types of government property have been opened to the public is just one "factor to consider in determining whether the government has opened its property to the use of the people for communicative purposes." (*Id.,* 461 U.S. at p. 177 [75 L.Ed.2d at p. 744, 103 S.Ct. at p. 1707].) This supports the approach that rejects a rigid formulation for First Amendment analysis.

In *Perry Educ. Assn.* v. *Perry Local Educators' Assn., supra,* 460 U.S. 37 the court refers to a "spectrum" (*id.,* 460 U.S. at p. 45 [74 L.Ed.2d at p. 804, 103 S.Ct. at p. 954]), describes streets and parks as "*quintessential* public forums" (*id.,* 460 U.S. at p. 45 [74 L.Ed.2d at p. 804, 103 S.Ct. at p. 955], italics added), and says that public property which is not a forum by "tradition or designation" (*ibid.*), is a category of place where "the state may reserve the *forum* for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view. [Citation.]" (*Ibid.,* italics added.) This last category is a "nonpublic forum." The court said that in such a place "distinctions in access on the basis of subject matter and speaker identity. . . . are inherent and inescapable in the process of limiting a nonpublic forum to activities *compatible with the intended purpose* of the property. The touchstone for evaluating these distinctions is whether they are reasonable *in light of the purpose which the forum at issue serves.*" (*Id.,* 460 U.S. at p. 49 [74 L.Ed.2d at p. 807, 103 S.Ct. at p. 957, fn. omitted, italics added.)

In the instant case using this standard, this court must consider whether the Conversion Project's distribution of literature and showing of slides about government policies on nuclear weapons and energy is compatible with the "intended purpose" of the Visitors Center. This requires a careful analysis of just how deep "the basis of subject matter" criterion may delve. If the Center's intended purpose is to present *only* the official

government "line," and to persuade the public of its correctness, and to preclude informed debate—then any literature critical of government policy would be "incompatible." But if the Center's purpose is merely to inform- the public about the work of the Laboratory, then it is difficult to see how dissemination of literature critical of the government's nuclear policy (and the Laboratory's role in that policy) could interfere with that purpose. Is it constitutionally permissible in this state to require ideological compatibility? Once again this raises concerns about what the appropriate balance should be, when the government itself is the speaker. This issue of "government speech" [see discussion in opinion] is critical in our state, which recognizes "the public's interest in maximizing the availability of effective free speech forums." (Note, *Robins* v. *Pruneyard Shopping Center: Free Speech Access to Shopping Centers Under the California Constitution* (1980) 68 Cal.L.Rev. 641, 664; see also discussion of a comparable issue in *Bailey* v. *Loggins* (1982) 32 Cal.3d 907 [187 Cal.Rptr. 575, 654 P.2d 758].)

The issue in *U.S. Southwest Africa/Namibia Trade and Cultural Council* v. *U.S.A., supra,* (D.C. Cir. 1983) 708 F.2d 760, was whether the U.S. government could preclude political advertising from the display cases along the concourse at National and Dulles airports. The district court had upheld the ban, on the basis that the display advertising areas were "nonforums." The appeals court disagreed, saying that whether the display areas were a forum required an evaluation of the nature of the entire airport. It then characterized the airport terminals as public thoroughfares, and classified the "public areas of National and Dulles squarely within the public forum family." (*Id.,* at p. 766.) The court emphasized the "consideration of 'place' that underlies the concept of the public forum." (*Id.,* at pp. 765-766.) It distinguished *Lehman* v. *City of Shaker Heights, supra,* 418 U.S. 298 (upholding ban on political advertising in buses) by observing the differences in the essential nature of buses as opposed to advertising space in airport terminals: (1) buses are not a place where the "free flow of information is especially vital" (*id.,* at p. 766); and (2) people on a bus are a captive audience who cannot "simply . . . walk away" (*id.,* at p. 767) from an objectionable message.

The circuit court also said the FAA's revenue interest in the advertising space could support a distinction between commercial and political ads *only* if it could show the distinction was financially necessary *and* that no less restrictive means were available to protect the government's financial interest.

The court commented on the difficulty of distinguishing between commercial and political speech, saying "the capacity of commercial speech to communicate simultaneously political and social messages can be discerned

by anyone who gives second thought to a 'public relations' advertisement by an industrial manufacturer of defense-related equipment. . . ." (*Id.,* at p. 769.) This point can also be made about the purportedly "educational" and "scientific" literature and displays at the Visitors Center.

The court emphasized that it intended a narrow holding, based on "careful calculation" about the conflicting interests involved in the "unique public property" of the airport advertising space. (*Id.,* at p. 773.) It noted that such calculation "could lead to entirely different results in . . . specialized government *media* not generally available for lease by the public, . . . or in government *media* dedicated to official agency business." (*Id.,* at pp. 773-774, italics added.)

In our view this language is consistent with our analysis in the instant case. It may imply that the project could not assert a constitutional right to use the Laboratory's extensive internal communications network, or to print their views in the Laboratory's own publications. But the primary significance of this passage is that it affirms the necessity of a careful examination in each case of the nature of the forum, and of the interests involved.

*United States* v. *Albertini, supra,* 710 F.2d 1410, affirmed the right of an individual to distribute antiwar pamphlets during a visitors' day at an air force base. It discussed at length how to assess whether government property open to the public is a public forum. It said that a critical point of inquiry is whether "[t]he place or its intended use . . . somehow render[s] the facility appropriate for expression." (*Id.,* at p. 1414.) Since the purpose of the visitors' day was to provide for public participation and to "present the military's view in the current arms debate, to show the public that its money is being used efficiently, that the forces are 'strong and ready[,]'" the court held that the base was "opened to the public for purposes inextricably associated with and appropriate for expression. The base therefore constituted a public forum for the duration of the day's festivities." (*Id.,* at p. 1415.)

Moreover, the *Albertini* court held that at *least* the base was a "'limited public forum'" (*id.,* at p. 1416) for the day, and in that context ". . . the communicative purpose of the Air Force's open house greatly strengthens Albertini's claim to access." (*Id.,* at p. 1416.) This was because, by using the visitors' day to communicate its message to the public "that defense appropriations were being wisely used, [the Air Force] *clearly established that subject matter as an appropriate one for debate.*" (*Id.,* at p. 1416, italics added; see discussion of *Perry Educ. Assn.* v. *Perry Local Educators' Assn., supra,* 460 U.S. 37 [74 L.Ed.2d 794, 103 S.Ct. 948], *ante,* at p. 1165 of this opinion.) And therefore, "Albertini's peaceful protest

against the arms race was clearly within the *designated subject matter.*" (*Id.,* at p. 1416, italics added.) The court then applied the *Grayned* basic compatibility test.

■ In the case at bar, the Visitors Center is an enclosed place owned and operated by the government and open to the public at large. While it is obviously distinguishable from a street or park, it is just as clearly distinguishable from a hospital or prison. The primary purpose of the Center is to disseminate information. Visitors are allowed to roam freely around the Center, to pick up literature, study posters and other displays, and presumably to discuss all they are exposed to. This environment falls somewhere in the middle of the continuum, in the category Lawrence Tribe describes as a "semi-public forum." (Tribe, *op. cit. supra,* at p. 690; see also *Dallas Ass'n, etc.* v. *Dallas Cty. Hosp. Dist.* (5th Cir. 1982) 670 F.2d 629, 630-631, cert. den. (1982) 459 U.S. 1052 [74 L.Ed.2d 619, 103 S.Ct. 471] [state-owned hospital as "limited public forum"];[1] and *Perry Education Assn.* v. *Perry Local Educators' Assn., supra,* 460 U.S. at pp. 47-48 [74 L.Ed.2d at p. 806, 103 S.Ct. at p. 956].) Therefore, "[t]he crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." (*Grayned* v. *City of Rockford, supra,* 408 U.S. at p. 116 [33 L.Ed.2d at p. 232].)

■ Appellants argue vigorously that the government's use of the Visitors Center to communicate with the public does not—and should not—create a public forum. They urge the principle that the government has a "right to choose the message *it* wishes to communicate in facilities which it has set aside for that purpose (whether the facility be a museum, a visitors' center, an opera house, or a theater). . . ."

The idea that because the government owns this property it *alone* has the right to communicate with the public there raises serious concerns. As a number of commentators have observed, ". . . free speech theory has focused on the government as censor; it has had little to say about the process by which the government adds its voice to the marketplace." (Shiffrin, *Government Speech, op. cit. supra,* 27 UCLA L.Rev. 565, 569-570.)

It has been provocatively argued that an implied "establishment clause" should be read into the First Amendment, and that the answer to the argu-

---

[1] Note that the United States Supreme Court denied certiorari in *Dallas* over Justice Rehnquist's specific objection that the Court of Appeals had "misunderstood the distinction" between traditional public forum areas like streets and parks and other public property. (*Dallas Cty. Hosp. Dist.* v. *Dallas Ass'n, etc.* (1982) 459 U.S. 1052 [74 L.Ed.2d 619, 103 S.Ct. 471], dis. opn. of Rehnquist, J.)

ment that "the government has a compelling interest in stimulating support for its programs" is that "no such government interest exists." (Kamenshine, *The First Amendment's Implied Political Establishment Clause* (1979) 67 Cal.L.Rev. 1104, 1116.) While we do not go this far, we share Professor Kamenshine's concern about "institutional" or government speech, and note his point that, "[t]he fact that the political process is the primary source of control over government makes it all the more important that courts prevent the government from manipulating that process." (*Id.*, at p. 1119; *Bailey* v. *Loggins, supra,* 32 Cal.3d 907, 919.)

The issue in *Bailey* was whether prison officials could prevent publication of an article critical of prison policy, in a newspaper produced by prison inmates. The court examined the *purpose* served by the paper, the regulations governing it, and the actual application of the regulations by officials.

The court found the paper to be "a limited forum for prisoner expression" (*id.*, at p. 915), and to have "an important communicative purpose." (*Id.*, at p. 916.) Thus the prison could not censor articles because of their *content,* could not employ standardless regulations giving officials too much discretion, and must apply its regulations even-handedly. (*Id.*, at pp. 920-921.)

Thus, we conclude that the Project's right to have access to the Visitors Center as ordered by the court below is protected by article I, section 2 of the California Constitution as a use compatible with the purpose and function of the Visitors Center. (See *In re Hoffman* (1967) 67 Cal.2d 845, 851 [64 Cal.Rptr. 97, 434 P.2d 353]; *Prisoners Union* v. *Department of Corrections, supra,* 135 Cal.App.3d 930; *United States* v. *Albertini, supra,* 710 F.2d at 1410.) Moreover, we consider it critically important for a government facility whose primary purpose is to describe and explain government activity or policy (which certainly includes the work of the Laboratory) to accommodate a meaningful exchange of views by the public. This decision reflects the high value placed in our state on the "free marketplace of ideas" and robust debate which are essential to the proper workings of our constitutional system. (See *Robins* v. *Pruneyard Shopping Center, supra,* 23 Cal.3d at pp. 908-910; *Prisoners Union* v. *Department of Corrections, supra,* 135 Cal.App.3d at p. 939.)

The dissent contemplates that in the future courts may decide that visitors' centers in places such as Muir Woods, Yosemite Park, or even museums must allow literature or informational displays to communicate views that dissent from government policies. Far from sharing our dissenting colleague's alarm at such a prospect, we believe that it is just such a robust

exchange of ideas that the free speech provisions of the Constitution were designed to protect and promote.

■ The question of access to the Building 123 Auditorium raises different constitutional concerns.

The auditorium is located within a fenced area of the Laboratory complex. It was designed and built, and is in fact primarily used, for "large technical group meetings" during the normal course of work at the Laboratory. The essential nature and purpose of the auditorium clearly do not qualify it as a traditional public forum, nor even as a "semi-public forum" as discussed above. The auditorium therefore is closer to that end of the "public forum" continuum where prisons and hospitals would be placed. Indeed respondents acknowledge that they have no abstract affirmative right to access to the auditorium. But the Laboratory allows outside groups to use the auditorium after normal working hours and on weekends for various purposes, so long as a Laboratory employee "sponsors" the outside group. Appellants have therefore "opened the forum." (See *Dulaney* v. *Municipal Court* (1974) 11 Cal.3d 77, 82 [112 Cal.Rptr. 777, 520 P.2d 1].) Respondents challenge the employee sponsorship requirement on free speech and equal protection grounds, relying again on the state and federal Constitutions.

Appellants recognize that once a public facility is opened to use by members of the public, any policy governing access to that facility which is "based upon the content of speech" requires strict scrutiny. (*Consolidated Edison Co.* v. *Public Serv. Comm'n* (1980) 447 U.S. 530, 535-536 [65 L.Ed.2d 319, 326-327, 100 S.Ct. 2326].) They argue, however, that their employee sponsorship rule is "completely neutral as to content," so that judicial review is limited to an assessment of the policy as a "reasonable regulation of time, place and manner regulation."

In the context of licensing requirements, the Supreme Court has made it clear that even a content-neutral procedure reasonably regulating time, place and manner of protected activity, must be " '. . . fairly administered by officials within the range of narrowly limited discretion.' " (*Dulaney* v. *Municipal Court, supra,* 11 Cal.3d at p. 84, quoting from *Dillon* v. *Municipal Court* (1971) 4 Cal.3d 860, 869-870 [94 Cal.Rptr. 777, 484 P.2d 945].) Furthermore, " 'any procedure which allows . . . officials wide or unbounded discretion in granting or denying permits is constitutionally infirm because it permits them to base their determination on the content of the ideas sought to be expressed.' " (*Ibid.*)

An evaluation of the Laboratory's employee sponsorship policy must be guided by this principle. In the leading case of *Danskin* v. *San Diego Unified*

*Sch. Dist.* (1946) 28 Cal.2d 536 [171 P.2d 885], the Supreme Court held that once the doors of a school building have been opened for public meetings, permits for its use could not be issued based on an applicant's convictions and affiliations. (*Id.,* at p. 547.) "Requirement of proof of one's convictions and affiliations . . . as a condition of exercising the rights of free speech and free assembly, would compel a forfeiture of those rights by those who were unable or unwilling to submit proof that was acceptable." (*Id.,* at p. 548.)

In the instant cases the Laboratory conditions use of the auditorium on "sponsorship" by an employee. Presumably employees are completely free *not* to sponsor any particular group, for any reason. Therefore any outside group unable to find an employee who is willing to request permission to use the auditorium on its behalf must forfeit its free speech rights in that forum.

Moreover, there are apparently no guidelines for the Laboratory officials who approve employees' requests to use the auditorium for events they do wish to sponsor. Appellants quarrel with respondents' attempt to show, in the court below, that Laboratory officials in fact acted on the basis of impermissible content-based discrimination when they denied the use of the auditorium to a Project member who was also a Laboratory employee. Appellants object that evidence of the Laboratory's content-based discrimination, consisting of newspaper accounts attached as exhibits to an affidavit, was not properly before the court, that it was contradicted by the declaration of a Laboratory official, and that in the end the Laboratory granted the request anyway. Actually the fact that the Project's request for use of the auditorium, which had initially been denied, was granted *after* this lawsuit was filed raises serious doubt about the Laboratory's purported explanations justifying the original denial. In any case, it is unnecessary for the Project to prove any instances of actual past content-based discrimination in order to have a standardless policy allowing arbitrary and capricious denial of First Amendment rights struck down. They need only show, as the uncontradicted facts in the record reflect, that they were in fact denied use of the auditorium under a policy which "contains no standards whatsoever—let alone standards designed to be 'narrow, objective and definite.'" (*Dillon* v. *Municipal Court* (1971) 4 Cal.3d 860, 870 [94 Cal.Rptr. 777, 484 P.2d 945]; see also *City of Indio* v. *Arroyo* (1983) 143 Cal.App.3d 151, 159-160 [191 Cal.Rptr. 565]; *Shuttlesworth* v. *Birmingham* (1969) 394 U.S. 147, 150-151 [22 L.Ed.2d 162, 166-167, 89 S.Ct. 935].) This is enough to establish a violation of the principle of equal protection, since unfettered "discretion has the potential for becoming a means of suppressing a particular point of view." (*Heffron* v. *Int'l Soc. for Krishna Consc.* (1981) 452 U.S. 640, 649 [69 L.Ed.2d 298, 307, 101 S.Ct. 2559].)

A standardless policy like the employee-sponsorship requirement violates the free speech and assembly provisions of the state and federal Constitutions because it operates as a prior restraint on speech, since employees are free to decline sponsorship for any reason, including disagreement with the content (beliefs, political views, goals) of a group's proposed expressive activity. In addition, the policy has a significant "chilling" effect on the exercise of free speech rights. It is probably inevitable that even an employee sympathetic to the views of an outside group critical of the employer would not feel free to ask that employer for permission for the group to present a program on the employer's property. And finally, the policy violates the equal protection provisions of the California and United States Constitutions because it allows the Laboratory to discriminate arbitrarily and capriciously against any given group seeking use of the auditorium even *with* employee sponsorship.

The wording of the injunction carefully addresses these constitutional concerns without usurping the Laboratory's authority to grant or deny access for the Conversion Project to the Building 123 auditorium. Under the terms of the injunction the Laboratory may not require the project to secure sponsorship by an employee in order to use the auditorium, nor may it "[discriminate] against the [Project] on the basis of [its] views, opinions, policies or goals in providing access to . . . Building 123 Auditorium. . . ."

Thus the Laboratory is merely required to exercise its authority in a constitutional manner. It may do so by absolutely denying access to the auditorium for all outside groups, or by developing and implementing a policy with reasonable standards for the use of the auditorium, including reasonable time, place and manner regulations.

*Conclusion*

The trial court did not abuse its discretion in issuing the preliminary injunction. The particular requirements of the order were not addressed by the parties, and they appear reasonable in light of the interests at stake. Denial of the injunction would prevent the free exercise of constitutionally protected rights by respondents, which must always be considered a serious harm. Granting the injunction will merely require the Laboratory to accommodate the Project's expressive activities in the Visitors Center, and to exercise its control over access to the Building 123 auditorium in a constitutional manner. While these requirements may cause some administrative inconvenience, certainly this is not a harm which outweighs the abridgement of a constitutional right. The judgment of the superior court is affirmed.

Feinberg, J., concurred.

**SCOTT, J.,** Dissenting.—The majority has held, I believe, that whenever the state maintains a facility which is open to the public and whose primary purpose is to describe or explain government activity or policy, the state is constitutionally compelled to "accommodate a meaningful exchange of views by the public" in that facility, and regarding that activity or policy.[1] However, neither the parties nor the majority has cited any case in which a state-operated information facility such as that at issue here has been held to be a public forum, or even a limited public forum, for purposes of First Amendment analysis; and this court's independent research has not unearthed any such case. The ramifications of the majority's unprecedented application of the public forum doctrine reach far beyond the facts of this case. Hereafter, for example, if the majority is correct, the information centers at Muir Woods and Yosemite must make room for literature and exhibits by those who oppose public ownership of land. Access must be provided at visitors centers in state-maintained historical sites, in display cases in public buildings, perhaps even in museums, for groups and individuals with views to express and messages to communicate. I cannot agree that either the United States or the California Constitutions requires such a result.

It is unquestionable that the right to criticize government administration, and to take positions on current political controversies, lies at the core of the First Amendment. (*Bailey* v. *Loggins* (1982) 32 Cal.3d 907, 921, fn. 10 [187 Cal.Rptr. 575, 654 P.2d 758].) It does not follow, however, that whenever the state maintains a facility for the dissemination of information to the public, it violates either the First Amendment or article I, section 2 of the California Constitution unless it allows the public to use that facility to express its views.

The existence of a right of access to public property for expressive purposes, and the standard by which limitations upon the right must be evaluated, depend on the character of the property at issue. (*Perry Educ. Assn.* v. *Perry Local Educators' Assn.* (1983) 460 U.S. 37, 44 [74 L.Ed.2d 794, 804, 103 S.Ct. 948, 954].) Public places historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered without more, to be "public forums." (*United States* v. *Grace* (1983) 461 U.S. 171, 177 [75 L.Ed.2d 736, 743, 103 S.Ct. 1702, 1706-1707].) In such places, used historically for purposes of assembly,

---

[1] In fact, the majority has not expressly stated that access must be granted *only* to those who seek to communicate their opinions about the government's nuclear policy and the Laboratory's role in that policy. Nevertheless, because of the majority's characterization of the center as a "semi-public forum" and its stress on the nature of the information disseminated by the government there, it appears that the majority has not held that access must be granted for expressive activity by any group, regardless of subject matter.

communicating thoughts between citizens, and discussing public questions, the government's ability to restrict expressive conduct is extremely limited. Reasonable time, place, and manner regulations are permissible, provided those regulations " 'are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.' [Citations.]" (*Id.*, at p. 177 [75 L.Ed.2d 736, at pp. 743-744, 103 S.Ct. at p. 1707]; *Perry Educ. Assn., supra,* 460 U.S. at p. 46 [74 L.Ed. at p. 805, 103 S.Ct. at p. 955].) Any additional restriction such as an absolute prohibition on a particular type of expression will be upheld only if narrowly drawn to accomplish a compelling state interest. (*United States* v. *Grace, supra,* 461 U.S. at p. 177 [75 L.Ed.2d at p. 744, 103 S.Ct. at p. 1707].)

A second category consists of public property which has been opened for use by the public as a place for expressive activity. For example, a municipal theater designated as a meeting place for civic, educational, religious, patriotic, and charitable organizations is such a forum. (*Southeastern Promotions, Ltd.* v. *Conrad* (1975) 420 U.S. 546, 549, fn. 4, 555 [43 L.Ed.2d 448, 454, 457, 95 S.Ct. 1239].) This category also includes facilities opened as a public forum for a limited period of time (*Perry Educ. Assn., supra,* 460 U.S. at p. 46 [74 L.Ed.2d at p. 805, 103 S.Ct. at p. 955]), for a limited purpose such as use by certain groups (e.g., *Widmar* v. *Vincent* (1981) 454 U.S. 263, 267-270 [70 L.Ed.2d 440, 445-447, 102 S.Ct. 269] [student groups]), or for the discussion of certain subjects (e.g., *Madison Sch. Dist.* v. *Wisconsin Emp. Rel. Comm'n* (1976) 429 U.S. 167, 173-176 [50 L.Ed.2d 376, 383-385, 97 S.Ct. 421] [school board business].)

When the government creates such a forum, even if it was not required to create the forum in the first place, it is bound by the same standards as apply in a traditional public forum. Reasonable time, place and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest. (*Perry Educ. Assn., supra,* 460 U.S. at p. 46 [74 L.Ed.2d at p. 805, 103 S.Ct. at p. 955].)

However, "[p]ublic property which is not by tradition or designation a forum for public communication is governed by different standards." (*Id.,* at p. 46 [74 L.Ed.2d at p. 805, 103 S.Ct. at p. 955].) The Constitution does not guarantee access for First Amendment purposes simply because property is owned or controlled by the government. (*U. S. Postal Service* v. *Greenburgh Civic Assns.* (1981) 453 U.S. 114, 129 [69 L.Ed.2d 517, 529, 101 S.Ct. 2676].) Publicly owned property which is not a public forum may be subject to a prohibition of speech, leafleting, picketing, or other forms of communication without running afoul of the First Amendment, provided only that the government acts reasonably in imposing such restrictions, and

that its prohibition is content-neutral. (*Id.*, at p. 131, fn. 7 [69 L.Ed.2d at p. 531]; *Perry Educ. Assn.*, *supra*, 460 U.S. at p. 46 [74 L.Ed.2d at p. 805, 103 S.Ct. at p. 955].)

The Visitors Center here unquestionably falls within this latter category. The fact that the center is open to the public does not make it a public forum. (*United States* v. *Grace, supra*, 461 U.S. at p. 177 [75 L.Ed.2d at p. 744, 103 S.Ct. at p. 1707].) Nor does its use for communication from the government to the public make it a public forum. If that were true, " '. . . display cases in public hospitals, libraries, office buildings, military compounds, and other public facilities, would immediately become Hyde Parks open to every would-be pamphleteer and politician. This the Constitution does not require.' [Citations.]" (*Perry Educ. Assn.*, *supra*, 460 U.S. at p. 48 [74 L.Ed.2d at p. 807, 103 S.Ct. at p. 957, fn. 9].) Here there is no evidence that the center was ever opened for meetings, debate, discussion or other expressive activity *by the public*; on the contrary, the evidence was undisputed that the center has never been made available to groups or individuals for the display, distribution or sale of literature, or for the showing of films or slides. The majority's conclusion that the center is a "semi-public forum" is inconsistent with the foregoing authority, and is unsupported by the evidence.

As it is undisputed that no outside group has been allowed to display literature inside the center, there has been no discrimination on the basis of content, and the only question is whether the restriction is reasonable. (*Id.*, at p. 46 [74 L.Ed.2d at p. 805, 103 S.Ct., at p. 955]; *U. S. Postal Service* v. *Greenburgh Civic Assns.*, *supra*, 453 U.S. 114, 131, fn. 7 [69 L.Ed.2d 517, 531].) Given the purpose of the facility and its limited size, and the complications inherent in opening the center for expressive activity by the public, I would conclude that appellants' decision to allow leafleting in the parking lot, but not in the center itself, was reasonable.

Perhaps in tacit recognition of these principles, the majority does not state that appellants have violated the First Amendment; instead, the majority rests its decision on the California Constitution. I recognize that our state's constitutional guarantee of the right of free speech has been construed to be more definitive and inclusive than that of the First Amendment. (*Robins* v. *Pruneyard Shopping Center* (1979) 23 Cal.3d 899, 908-911 [153 Cal.Rptr. 854, 592 P.2d 341], affd., *Pruneyard Shopping Center* v. *Robins* (1980) 447 U.S. 74 [64 L.Ed.2d 741, 100 S.Ct. 2035]; *Prisoners Union* v. *Department of Corrections* (1982) 135 Cal.App.3d 930, 939 [185 Cal.Rptr. 634].) However, I cannot agree that California law compels the result reached by the majority.

In *Prisoners Union* v. *Department of Corrections, supra,* 135 Cal.App.3d 930, upon which the majority relies, a parking lot outside a prison was open to members of the public visiting the prison. Although organizations representing employees of the prison used the lot as a forum for communicating with prison employees, the prison denied a request by the prisoners union, an organization concerned with the welfare of prisoners and their families, to distribute literature at a card table in the parking lot. Clearly the lot was at least a limited public forum, and the court's analysis of the standards applicable to the Union's request is not relevant to nonpublic forum property such as that at issue in this case.

*In re Hoffman* (1967) 67 Cal.2d 845 [64 Cal.Rptr. 97, 434 P.2d 353] is similarly distinguishable. At issue in that case was the right of individuals to distribute leaflets at a railroad station, a facility which, unlike the Visitors Center, so resembles a public thoroughfare as to make it an appropriate place for the exercise of First Amendment rights. (*Albany Welfare Rights Organization* v. *Wyman* (2d Cir. 1974) 493 F.2d 1319, 1323.)

Accordingly, I would reverse that portion of the judgment ordering that appellants permit respondents to display literature, hang posters, and show slides in the Visitors Center.[2]

I would affirm the trial court's injunction with respect to the employee sponsorship regulation for use of the auditorium, however, because appellants have not justified the existence of that regulation. It must be emphasized that what is at issue is not a facility opened for use for a particular group (e.g., *Widmar* v. *Vincent, supra,* 454 U.S. 263, 267-270 [student groups]); rather, appellants have apparently made the auditorium available for events open to the general public, provided an employee sponsors the activity. Appellants had no obligation to open the auditorium at all. When a state elects to make a building available for public meetings, however, it cannot arbitrarily prevent any members of the public from holding such meetings. (*Danskin* v. *San Diego Unified Sch. Dist.* (1946) 28 Cal.2d 536, 545 [171 P.2d 885].) When a state opens a facility for use by the public for expressive activities, reasonable time, place and manner regulations are per-

---

[2]Even if I were to agree that appellants created some sort of public forum when they invited the public to the Visitors Center, I would be troubled by the uncertain standard promulgated by majority, and against which appellants must measure any future requests to use the center. The majority declares that the crucial question is "whether *the manner of expression* is basically incompatible with the normal activity of a particular place at a particular time." (*Ante,* p. 1168, italics added.) Elsewhere in its opinion, however, the majority seems to suggest that this incompatability test relates not to the manner by which respondent expresses its message, but to its subject matter. If so, the majority has not explained to what extent appellants may consider subject matter in evaluating any new access requests without running afoul of prohibitions against discrimination based on content.

missible, and any content-based prohibition must be narrowly drawn to effectuate a compelling state interest. (*Perry Educ. Assn.*, *supra*, 460 U.S. at p. 46 [74 L.Ed.2d at p. 805, 103 S.Ct. at p. 955].)

Appellants argue that the employee sponsorship regulation is content-neutral and is therefore constitutionally permissible. However, that is not the end of the inquiry. In addition to being content-neutral, reasonable time, place and manner regulations must be narrowly tailored to serve a significant government interest, and leave open ample channels of communication. (*United States* v. *Grace, supra,* 461 U.S. at p. 177 [75 L.Ed.2d at p. 744, 103 S.Ct. at p. 1707].) "[J]ustifications for selective exclusions from a public forum must be carefully scrutinized." (*Police Department of Chicago* v. *Mosley* (1972) 408 U.S. 92, 98-99 [33 L.Ed.2d 212, 218-219, 92 S.Ct. 2286].) Appellants argue that making the facility available for employee-sponsored events boosts employee morale; however, their reason for opening the facility in the first place does not justify the exclusion at issue. Appellants also argue that the employee-sponsorship requirement serves to limit use of the auditorium, so as to preserve its essential availability for official scientific business; however, they have not established that this purpose cannot be served by a more narrowly tailored regulation, which would not exclude all members of the general public unable to secure employee sponsorship. Therefore, while I would reverse that portion of the injunction addressed to use of the Visitors Center, I would affirm the injunction insofar as it prohibits both enforcement of the employee-sponsorship regulation and content-based discrimination in providing access to the Building 123 Auditorium.

On May 23, 1984, the opinion was modified to read as printed above. Appellants' petition for a hearing by the Supreme Court was denied July 11, 1984.