[No. G015646. Fourth Dist., Div. Three. Nov. 30, 1994.]

KEITH A. DIXON, Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
SCIENTIFIC RESOURCE SURVEYS, INC., et al., Real Parties in
Interest.

## COUNSEL

Strumwasser & Woocher, Michael J. Strumwasser, Frederic D. Woocher and Susan L. Durbin for Petitioner.

ACLU Foundation of Southern California, Center for Human Rights and Constitutional Law, and California Faculty Association as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Bidna & Keys, Howard M. Bidna and Harvey M. Moore for Real Parties in Interest.

## OPINION

**WALLIN, J.**—In this petition for writ of mandate we are asked to interpret recently enacted legislation (Code Civ. Proc., § 425.16) designed to curtail a growing number of SLAPP (Strategic Lawsuits Against Public Participation) suits.[1]

---

[1]The acronym SLAPP was coined by two University of Denver professors, Penelope Canan and George W. Pring. (See Comment, *Strategic Lawsuits Against Public Participation: An Analysis of the Solutions* (1990/1991) 27 Cal. Western L.Rev. 399.)

▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*Factual and Procedural Background*

At the heart of this controversy is a 22-acre portion of the California State University at Long Beach (CSULB) campus long believed by many Native American Indians to be part of an ancient Indian village known as Puvunga. In 1974, following nomination by petitioner Keith Dixon, an archaeologist and professor emeritus of anthropology at CSULB, the Puvunga site[2] was accepted for inclusion on the National Register of Historic Places.

Sometime in late 1979 or early 1980, CSULB contracted with Scientific Resource Surveys, Inc. (SRS) to perform archaeological tests on a portion of the Puvunga site on which it wanted to build a Japanese garden and museum. The 1980 report prepared by SRS concluded the proposed project would cause no "adverse effects to archaeological and/or historic resources." In early 1981, the director of CSULB's physical planning and development department forwarded a copy of SRS's archaeological report to the anthropology department for review and comments. Dixon, along with another faculty member, responded with a critique of the report. Dixon's detailed letter concluded the report was "poorly done," biased and should be withdrawn and revised. Should the report not be withdrawn, Dixon requested that his critique be "forwarded under legal provisions for public review of a negative declaration."[3] Despite Dixon's objection, CSULB proceeded with its Japanese garden project and, apparently, continued to contract with SRS to perform a variety of archaeological work on campus.

In 1992, CSULB planned to construct a strip mall (apartment buildings and retail stores) and a parking lot on the Puvunga site. In compliance with the California Environmental Quality Act, Public Resources Code section 21050 et seq. (CEQA),[4] CSULB commissioned Envicom Corporation to conduct a study on the environmental effects of the proposed development. In December 1992, Envicom issued a report which concluded the proposed project would not significantly impact the local environment, result in alteration or destruction of an archaeological site, or affect cultural values or sacred or religious uses in that area. Based on those findings, the report recommended CSULB adopt a negative declaration.

Dixon learned of the proposed negative declaration and began a letter writing campaign challenging its findings in January 1993. He first wrote to

---

[2] Archaeological sites throughout California are registered with one of California's 11 regional archaeological information centers and given a numerical designation. The Puvunga site was designated LAn-234 and LAn-235.

[3] The California Environmental Quality Act requires the public agency which prepares the environmental impact report or negative declaration to consider any information or comments it receives. The information or comments may be submitted in any format and may be included in the report or declaration. (Pub. Resources Code, § 21082.1, subd. (b).)

[4] All future references are to the Public Resources Code unless otherwise indicated.

a CSULB official, claiming the determination in the negative declaration that the environment would not be adversely impacted by development was based on the report of an unnamed archaeological firm[5] that was "error-filled" and did not meet professional standards. Dixon also accused the unnamed firm of unprofessional secrecy. Following the meeting, CSULB agreed that it would conduct a "cultural review" of the Puvunga site and that neither SRS nor its president, Nancy Whitney-Desautels, would be involved in any further archaeological work on campus.[6]

In March 1993, Dixon wrote three letters to CSULB's vice-president. The first letter complained of the lack of response by the administration to his commentary on the negative declaration. In discussing the possible reasons for what he deemed his "excommunication" by CSULB administrators, Dixon cited his critique of the 1980 archaeological report prepared by SRS, which he claimed angered the administration. He further stated "[SRS] never did face the professional issues we raised or correct their factual errors. The SRS recommendations were what [the administration] wanted to hear, and [it] therefore had no interest in requiring that the SRS report be corrected or amended. The SRS response was ad hominem and simple reassertion of their work." The second letter complained of an independent peer review committee Dixon heard had been established by SRS to review its work on campus.

After learning that CSULB had contracted with SRS to perform continued consulting work related to the Puvunga site despite its agreement not to, Dixon wrote to the administration and complained: "In previous memos I recommended that another archaeological consultant be contracted for any future work on campus in order to avoid the biases that had been created due to SRS' previous work and the reactions of the Physical Planning Office. I recommended that the consultant be from off-campus and have no previous

[5]Although the archaeological firm was not named in Dixon's letter, it is clear he was referring to SRS. However, the negative declaration listed the documents relied on in making its determination and the SRS reports were not among them. SRS's opposition to the motion to strike included a declaration by the president of Envicom, in which he stated his company had no knowledge of any SRS reports at the time it conducted its investigation and prepared its report.

[6]Once the Native American Heritage Commission (NAHC), the state agency responsible for investigating threats to significant Native American sites on public lands, learned of CSULB's intention to adopt a negative declaration, it began its own investigation. Following a June 1993 hearing, NAHC concluded the only acceptable mitigation measure would be to refrain from developing any portion of the Puvunga site. That recommendation was made to and rejected by CSULB. Thereafter, NAHC sued CSULB, seeking an injunction against any further excavation or development of the Puvunga site. A preliminary injunction was granted pending the outcome of the case. That case is still pending and the injunction remains in force.

connection with SRS, as a means of avoiding controversy and getting the most objective results. . . . [¶] SRS is fully qualified to compete with other consultants in submitting proposals, and they should be expected to do so. What is in question is their performance on specific matters, for reasons explained in previous documents. (It appears that the administration does not care and evidently has no wish to comprehend professional standards when it already has the results that seem satisfactory; nevertheless, I think the record shows that this has compounded the problem.) [¶] Therefore, I recommend that SRS be asked to correct the factual errors in their previous reports and amend them appropriately before further proposals can be accepted; also, that their responses must be to professional issues and not arbitrary ad hominem defense."

In May 1993, Dixon wrote to CSULB requesting to review progress billing submitted by SRS. In that letter, he stated, "I should mention as a reminder that many of the campus' present problems with SRS stem from their earlier work, which was found by me . . . to be highly flawed and biased. [¶] SRS refused to correct their errors, and I believe there were two main reasons. First, because the reports presented a good appearance to a nonprofessional, SRS was paid before the administration asked us to review their report. Second, the SRS conclusions and recommendations were what the administration wanted or expected to hear in order to appear to satisfy CEQA requirements; therefore, even though our findings were documented, SRS was not asked to revise their report." At the time bids for the cultural review of the Puvunga site were solicited, CSULB asked SRS not to bid the contract because of Dixon's outspoken opposition.

SRS responded by filing the underlying lawsuit against Dixon. The complaint sought $570,000 in damages for intentional and negligent interference with contractual relations and prospective economic advantage, libel, slander and trade libel. SRS alleged its contractual relationship with CSULB had been destroyed by Dixon's oral and written statements to CSULB officials concerning the accuracy of previous SRS reports, the quality of services rendered by them, and accusations that SRS aligned itself with developers and tailored its reports to that end. Attached to the complaint were the five letters written by Dixon to CSULB officials between January and May 1993.

After filing his answer, Dixon moved to strike the complaint, which he characterized as a SLAPP suit, under Code of Civil Procedure section 425.16, subdivision (b). That section provides that any "cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special

motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." In support of the motion, Dixon attached his declaration in which he averred that the statements he made to CSULB officials were for the sole purpose of participating in the CEQA public comment and review process by informing them about the cultural, historical and archaeological significance of the Puvunga site and the potential environmental effects that further excavation and commercial development would cause. His statements regarding the quality of SRS's work and their competence as an archeological firm were not based on personal animosity; rather, they were based on a professional review of the documents SRS generated. He denied any participation in the NAHC proceedings regarding CSULB's proposed development or discussing his opinion of SRS's work with any member of the Native American community.

Dixon argued his statements were also entitled to absolute immunity under the First Amendment to the United States Constitution, article I, section 3, of the California Constitution and Civil Code section 47, subdivision (b).

SRS opposed the motion on the grounds the statements made by Dixon were not part of the CEQA review process and were not made to an official body in connection with an issue under consideration or in a place open to the public in connection with an issue of public interest. Since the negative declaration prepared by Envicom (but not yet adopted by CSULB) contained no mention of SRS's 1980 archaeological report, SRS contended Dixon's attack on that report, and its author, were outside the scope of the CEQA review process. SRS also argued that Dixon's statements were malicious and therefore not entitled to immunity. In support of its motions, SRS attached the declarations of its president, Nancy Whitney-Desautels, and several Native Americans who averred, among other things, that SRS is competent and respected by the Native American community as a whole. The declaration of a CSULB official indicated Dixon had been a "thorn in the side of CSULB" for years and had gone to great lengths to quash the opinions of professionals with whom he does not agree. Also included was a declaration of a Native American who averred that in February 1993, CSULB called a meeting of Native Americans for the purpose of discussing the proposed development of the Puvunga site. At that meeting, Dixon was said to have declared that SRS had earlier performed archaeological services on an unrelated Native American site which resulted in its desecration and destruction. The trial court denied the motion to strike and this writ petition followed.

*The Origin of SLAPP Suits and the Legislature's Response*

■ The *typical*[7] SLAPP suit involves citizens opposed to a particular real estate development. The group opposed to the project, usually a local neighborhood, protests by distributing flyers, writing letters to local newspapers, and speaking at planning commission or city council meetings. The developer responds by filing a SLAPP suit against the citizen group alleging defamation or various business torts. (Barker, *Common-Law and Statutory Solutions to the Problem of SLAPPS* (1993) 26 Loyola L.A. L.Rev. 395, 396.) SLAPP plaintiffs do not intend to win their suits; rather, they are filed solely for delay and distraction (*id.* at p. 397), and to punish activists by imposing litigation costs on them for exercising their constitutional right to speak and petition the government for redress of grievances. (See Comment, *SLAPP Suits: Weaknesses in First Amendment Law and in the Court's Responses to Frivolous Litigation* (1992) 39 UCLA L.Rev. 979.)

And "[w]hile SLAPP suits 'masquerade as ordinary lawsuits' the conceptual features which reveal them as SLAPP's are that they are generally meritless suits brought by large private interests to deter common citizens from exercising their political or legal rights or to punish them for doing so. [Citations.] Because winning is not a SLAPP plaintiff's primary motivation, defendants' traditional safeguards against meritless actions, (suits for malicious prosecution and abuse of process, requests for sanctions) are inadequate to counter SLAPP's. Instead, the SLAPPer considers any damage or sanction award which the SLAPPee might eventually recover as merely a cost of doing business. [Citations.] By the time a SLAPP victim can win a 'SLAPP-back' suit years later the SLAPP plaintiff will probably already have accomplished its underlying objective. . . . [Citations.]" (*Wilcox* v. *Superior Court, supra,* 27 Cal.App.4th at pp. 816-817, fn. omitted.)

In 1992, the Legislature responded to the problem of SLAPP suits by enacting Code of Civil Procedure section 425.16, which provides: "(a) The Legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process. [¶] (b) A cause of action against a person arising from any act of that person in furtherance of a person's right of petition or free speech under the United

---

[7]Although SLAPP suits involving environmental issues are common, they may involve other matters. (*Wilcox* v. *Superior Court* (1994) 27 Cal.App.4th 809 [33 Cal.Rptr.2d 446].)

States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim. In making its determination, the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based."

Acts "in furtherance" of a person's First Amendment rights are defined in section 425.16 to include, "any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; or any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest." (Code Civ. Proc., § 425.16, subd. (e).)

*Does the Complaint Filed by SRS Constitute a SLAPP Suit?*

 ██ The party moving to strike a complaint under Code of Civil Procedure section 425.16 has the burden of making a prima facie showing that the lawsuit arises " 'from any act of [defendant] in furtherance of [defendant's] right of petition or free speech under the United States or California Constitution *in connection with a public issue*.' [Citation.]" (*Wilcox* v. *Superior Court, supra,* 27 Cal.App.4th at p. 820, italics added.)

There is no dispute the proposed development of the Puvunga site and its related CEQA proceedings were matters of public concern. What is in dispute is whether Dixon's allegedly tortious statements were made in connection with those proceedings. SRS argues they were not because: (1) They were made after the CEQA proceedings had terminated with the issuance of the negative declaration; and (2) they were directed against SRS, which was not part of the CEQA proceedings.

There is no merit to SRS's first contention that the CEQA proceedings had terminated by the time Dixon began his letter writing campaign. When a proposed project may have a significant effect on the environment, CEQA requires the lead agency[8] to undertake an initial threshold study. If that study results in a finding the project will not significantly affect the environment, the agency may so declare in a negative declaration. (*No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 74 [118 Cal.Rptr. 34,

---

[8]The lead agency is the public agency responsible for carrying out or approving a project which may have a significant effect on the environment. (§ 21067.)

529 P.2d 66].) However, *before* adopting a negative declaration, the agency is required to give notice to the public and allow time for comments. (§ 21092; see also Guidelines, § 15072.)[9] During that time, any interested person or group has a right to express its views. (Guidelines, § 15073, subd. (a).)

■ Envicom's issuance of the negative declaration and the recommendation that it be adopted did not *end* the public review period; on the contrary, it *initiated* it. At that point Dixon began the first of many communications to the CSULB administration arguing against the adoption of the negative declaration. That being so, each of Dixon's allegedly slanderous and libelous comments was made during the public review period contemplated by CEQA and was, therefore, "in connection" with those proceedings.[10]

SRS's second contention, that its reports were not relied on by Envicom in reaching its finding, does not protect it from exposure to public scrutiny. SRS has been involved with the Puvunga site since 1980, when it performed archaeological tests on another portion of the site CSULB sought to develop. At that time, SRS concluded development of that area would cause no "adverse effects to archaeological and/or historic resources." During the current heated debate over development of the site and the proposed adoption of the negative declaration, SRS was asked to perform further testing, presumably to assist CSULB in reaching a decision as to whether to adopt the negative declaration. Given SRS's involvement with the Puvunga site and its position as to its archaeological significance (or lack thereof), it strains credulity for SRS to argue it was not involved in the CEQA proceedings.

■ Essential to CEQA proceedings is the public comment and review process; its purpose is to inform those who ultimately make important decisions regarding the environment. (§ 21003.1, subd. (b); *City of Sacramento* v. *State Water Resources Control Bd.* (1992) 2 Cal.App.4th 960, 969-970 [3 Cal.Rptr.2d 643]; *Laurel Heights Improvement Assn.* v. *Regents of*

---

[9] All references to "Guidelines" are to the state CEQA Guidelines, which implement CEQA. (Cal. Code Regs., tit. 14, § 15000 et seq.) And although the Supreme Court has not yet decided whether such guidelines are mandatory, it has held they are entitled to "great weight" except when clearly unauthorized or erroneous. (*Laurel Heights Improvement Assn.* v. *Regents of University of California* (1993) 6 Cal.4th 1112, 1123, fn. 4 [26 Cal.Rptr.2d 231, 864 P.2d 502].)

[10] There is a factual dispute in the record as to whether Dixon was present at one of the NAHC hearings held on the proposed development and made derogatory statements regarding SRS. Even assuming the truth of that allegation, those statements were likewise protected because they were clearly made in connection with the ongoing CEQA proceedings.

*University of California, supra,* 6 Cal.4th at p. 1123.) Adopting the narrow construction urged by SRS would not further that purpose. We conclude the comments made by Dixon were in connection with a public issue and fall within the statutory definition of Code of Civil Procedure section 425.16. That being so, the burden shifted to SRS to establish a probability of prevailing on its claim. (*Wilcox v. Superior Court, supra,* 27 Cal.App.4th at p. 819.)

### *Did SRS Make a Prima Facie Showing of Facts Which Would Support a Judgment in its Favor?*

Given our determination that Dixon made a prima facie showing that he was exercising his First Amendment right to petition the government in connection with a public issue,[11] he was entitled to have the complaint stricken unless SRS established a probability of prevailing at trial.

SRS argues it did so by offering evidence that the statements made by Dixon were made with "actual malice [and] with knowledge of their falsity or with reckless disregard for their truth." Citing *McDonald v. Smith* (1985) 472 U.S. 479 [86 L.Ed.2d 384, 105 S.Ct. 2787] for the proposition that "[t]he right to petition is guaranteed; the right to commit libel with impunity is not" (*id.* at p. 485 [86 L.Ed.2d at p. 390]), SRS argues if it can show Dixon acted with malice, he was not entitled to First Amendment protection and SRS has, therefore, established a probability of prevailing at trial.

In *McDonald,* an unsuccessful candidate for appointment as United States Attorney sued an individual who had sent letters to the President of the United States and other members of the administration falsely accusing the candidate of violating the civil rights of various individuals, fraud, extortion and blackmail. The complaint alleged the defendant knew the statements were false and they were made with malice. (472 U.S. at p. 481 [86 L.Ed.2d at pp. 387-388].) In rejecting the defendant's claim of absolute immunity, the Supreme Court held the right to petition is "cut from the same cloth" as other guarantees of the First Amendment. And to grant absolute immunity would improperly elevate the right to petition above other First Amendment guarantees. (*Id.* at p. 485 [86 L.Ed.2d at p. 390].) Under the law of the state in which the complaint was brought, plaintiff was entitled to damages on a showing of malice. (*Id.* at p. 485 [86 L.Ed.2d at p. 390].) Dixon contends, and we agree, that *McDonald* does not apply where, as here, a statute exists which expressly invites public comment.

In *Matossian v. Fahmie* (1980) 101 Cal.App.3d 128 [161 Cal.Rptr. 532], plaintiffs, owners of a delicatessen, moved to larger premises and applied to

---

[11]The CEQA proceedings constitute "official proceedings authorized by law" as set forth in Code of Civil Procedure section 425.16.

the Department of Alcohol Beverage Control (department) for transfer of their liquor license. The Business and Professions Code requires that such a request be accompanied by public notice and invites written protests by interested persons. (Bus. & Prof. Code, §§ 23985, 23986.) Any interested person has a *right* to express his or her views. (Bus. & Prof. Code, § 24013.) Following the required posting of notice of their transfer request, 15 people protested on the grounds the transfer would result in an " 'undue concentration of licenses.' " (101 Cal.App.3d at p. 134.) The department held a hearing and granted the transfer application. Thereafter, plaintiffs sued the protesters for various torts, including " 'tortious interference with a business.' " (*Ibid.*) Defendants' demurrers were sustained without leave to amend and summary judgment was granted. (*Id.* at p. 135.)

In affirming, the *Matossian* court held, " ' "The very idea of a government . . . implies a right on the part of its citizens . . . to petition for a redress of grievances." ' [Citations.] '[A]ny attempt to restrict those liberties must be justified by clear public interest, threatened not doubtfully or remotely, but by clear and present danger.' " (101 Cal.App.3d at pp. 135-136.) The court explained that "[w]here administrative agencies such as the Department must make factual determinations ' "the widest possible dissemination of information from *diverse and antagonistic sources* is essential to the welfare of the public[.]" ' [Citations.]" (*Id.* at p. 136, italics in original.) And motive is irrelevant: "We are persuaded by the foregoing authority and considerations that where, as here, a statute expressly invites or allows interested persons to protest, or give their views or opinions concerning, proposed or requested governmental administrative action, such persons singly or in combination have a lawful right to do so; in such a case the law will not permit judicial or other inquiry into the persons' purpose or motivation. . . . 'the motive, even if malicious, of defendants is unimportant if legal ground existed upon which to predicate' their protests. Such a right may not be defeated, or abridged, or 'chilled,' by threat or fear of civil action for exercising it." (*Id.* at p. 137.)

Here, as in *Matossian*, the statutory invitation for public participation bars any inquiry into the motives behind the statements or comments made. To bring himself within the protection of Code of Civil Procedure section 425.16, all Dixon had to do was show his statements were made in response to a matter of public concern. He did. Therefore, SRS could not, *as a matter of law*, have established a probability of prevailing at trial because even if it proved Dixon acted with malice, his statements are still entitled to absolute immunity. (Cf. *Long* v. *Pinto* (1981) 126 Cal.App.3d 946 [179 Cal.Rptr. 182].)

## Constitutional Challenges to Section 425.16

█ Finally, SRS raises several constitutional challenges to Code of Civil Procedure section 425.16. It first contends the section violates its right to due process by requiring a plaintiff to establish probability of success without the opportunity to conduct discovery. Specifically, it argues if it were permitted to conduct discovery, it would be able to show a triable issue of fact as to malice. But, as we hold, Dixon's motivation in making the complained of statements is irrelevant; thus, proof of malice is not material in this case.

█ SRS also contends the statute unconstitutionally deprives it of the right to trial by jury by requiring the court to weigh the evidence in ruling on the motion to strike. But the court does not weigh the evidence in ruling on the motion; instead, it accepts as true all evidence favorable to the plaintiff. (*Wilcox* v. *Superior Court, supra,* 27 Cal.App.4th at p. 828.) Moreover, the right to trial by jury pertains solely to questions of fact. (*Hung* v. *Wang* (1992) 8 Cal.App.4th 908, 927 [11 Cal.Rptr.2d 113].) Here, there was no question of fact to be decided by the trial court. Even if all of SRS's evidence is accepted as true, that is, that Dixon was waging a personal vendetta against SRS and was doing so maliciously, SRS still could not make a prima facie showing because Dixon's statements were entitled to absolute immunity.[12]

The alternative writ is dissolved. Let a peremptory writ of mandate issue directing the trial court to vacate its order denying petitioner's motion to strike the complaint and enter a new order granting the motion and dismissing the complaint.

Sills, P. J., and Sonenshine, J., concurred.

The petition of real parties in interest for review by the Supreme Court was denied March 23, 1995.

---

[12]SRS claims, almost in passing and without citation to authority, that Code of Civil Procedure section 425.16 is unconstitutionally vague and overbroad. SRS's failure to provide any support for its argument eliminates the need for this court to respond to that claim. (*Troensegaard* v. *Silvercrest Industries, Inc.* (1985) 175 Cal.App.3d 218, 228 [220 Cal.Rptr. 712].)