[No. A068903. First Dist., Div. One. Aug. 20, 1996.]

XI ZHAO, Plaintiff and Appellant, v.
DANIEL TAI-YUI WONG, Defendant and Respondent.

COUNSEL

McManis, Faulkner & Morgan, James McManis, Douglas Watanabe and Michael Reedy for Plaintiff and Appellant.

Ralph C. Alldredge for Defendant and Respondent.

OPINION

**SWAGER, J.**—The plaintiff in a slander action, Xi Zhao, appeals from a judgment of dismissal entered on an order striking her complaint under the anti-SLAPP statute, Code of Civil Procedure section 425.16 and from an order awarding costs.[1] We reverse.

## FACTUAL BACKGROUND

The complaint alleges that the defendant, Daniel Wong, falsely accused Xi Zhao of murdering his brother, Tai-Kin Wong, and forging his will. On December 31, 1992, Tai-Kin Wong, a molecular biologist, age 44, died suddenly of unexplained causes. Before his death, he was romantically linked with Xi Zhao, a molecular biologist employed at Stanford University. They had lived together for about three years and were the cofounders and sole shareholders of a genetic engineering firm, Transgenic Technologies, Inc., which possessed valuable patents for the genetic engineering of laboratory animals.

About 7 p.m. on New Year's Eve, Tai-Kin collapsed in his office but managed to call 911. When paramedics arrived, he was confused and suffering from nausea and vomiting. Four hours later, he died in a hospital emergency room. The case was investigated by the Alameda County Coroner's office which conducted an autopsy and an extensive series of toxicological tests. In a report issued February 26, 1993, the investigator described the case as involving "insignificant history with possible suspicious circumstances" and concluded that the cause of death was "undetermined."

About two weeks after his death, Xi Zhao and three business associates searched Tai-Kin's office and found a sealed envelope bearing romantic stickers in one of his desk drawers. When the envelope was later opened in the presence of a probate attorney, it contained a handwritten note which read "All Tai-Kin Wong's → Xi Zhao, my best half TKW 12-31-92." Construing the note as a holographic will, Xi Zhao filed a petition in probate. The decedent's father, Kok-Cheong Wong, countered by filing a will contest on May 14, 1993. The defendant, Daniel Wong, was not a party to the will contest proceeding. The trial court found the document to be a valid will passing all of Tai-Kin's estate to Xi Zhao. An appeal was filed on March 17, 1994. The judgment was reversed on the ground that the note did not manifest the requisite testamentary intent. (*Estate of Wong* (1995) 40 Cal.App.4th 1198 [47 Cal.Rptr.2d 707].)

---

[1]The acronym, SLAPP, which stands for "strategic lawsuits against public participation," has entered into common usage both to describe the statute and this category of litigation.

In February or March, 1994, a reporter for the San Jose Mercury News, Michael Dorgan, interviewed the defendant concerning his brother's death and the will contest. On June 16, 1994, appellant filed but did not serve a complaint against Daniel Wong in the San Francisco Superior Court alleging two causes of action for slander based on statements he had allegedly made to Dorgan and his father, Kok-Cheong Wong. On August 21, 1994, the San Jose Mercury News ran a front page article entitled *What—or Who—Killed Tai-Kin Wong*. The article did not mention the defendant as a source of information but rather relied on an interview with another brother, Tai-Shing Wong, who was quoted as saying, "I think he was murdered by very high technology—a biological agent." He charged that Xi Zhao had " 'the capability, opportunity and skill' " to commit the murder. The article further noted that the director of the Alameda County Coroner's office stated the office "ran more laboratory tests than they have on any other case in the three years he's been in charge," but "[t]esting for exotic poisons . . . is 'like looking for a needle in a haystack.' " The article mentioned certain disputed evidence that Xi Zhao had separated from Tai-Kin shortly before his death.

The defendant was served with the complaint about 10 days after the article appeared. On October 26, 1994, he filed a motion to strike the complaint under Code of Civil Procedure section 425.16, supported by a declaration of relevant facts. Without submitting an opposing declaration, Xi Zhao relied entirely on the legal defense, presented in her memorandum of points and authorities, that the complaint did not relate to "a public issue" within the meaning of Code of Civil Procedure section 425.16, subdivision (b). The trial court, however, took the view that the statute "is really written broadly" and "covers things that aren't SLAPP suits." Granting the motion to strike, the court relied particularly on the reasoning that "if you make a comment about a judicial proceeding, that's an act in furtherance of a person's right of petition [or] free speech."

## DISCUSSION

### A. *Statement of Legislative Purpose*

The appeal presents a significant issue regarding the scope of the anti-SLAPP statute, Code of Civil Procedure section 425.16. Identification of a SLAPP lawsuit presents difficulties and in order to decide this case we must examine the legislative purpose of the statute.

The Legislature enacted Code of Civil Procedure section 425.16 in response to evidence of a growing number of meritless lawsuits, usually

alleging tort liability, brought against citizens for exercising their rights of petition and freedom of speech.[2] The expression "SLAPP suit," strategic lawsuit against public participation, was coined by two University of Denver professors, George Pring and Penelope Canan, who have written the most influential studies of this phenomenon. In *Hull* v. *Rossi* (1993) 13 Cal.App.4th 1763, 1769 [17 Cal.Rptr.2d 457], the court defined a SLAPP suit simply as "one brought to intimidate and for purely political purposes."

As explained in *Wilcox* v. *Superior Court* (1994) 27 Cal.App.4th 809, 815-816 [33 Cal.Rptr.2d 446], "[t]he paradigm SLAPP is a suit filed by a large land developer against environmental activists or a neighborhood association intended to chill the defendants' continued political or legal opposition to the developers' plans. . . . [¶] SLAPP suits are brought to obtain an *economic* advantage over the defendant, not to vindicate a legally cognizable right of the plaintiff." The fact that the lawsuit may lack merit "is not of concern to the plaintiff because the plaintiff does not expect to succeed in the lawsuit, only to tie up the defendant's resources for a sufficient length of time to accomplish plaintiff's underlying objective. [Citation.] As long as the defendant is forced to devote its time, energy and financial resources to combating the lawsuit its ability to combat the plaintiff in the political arena is substantially diminished. [Citations.] The SLAPP strategy also works even if the matter is already in litigation because the defendant/cross-complainant hopes to drive up the cost of litigation to the point where the plaintiff/cross-defendant will abandon its case or have less resources available to prosecute its action against the defendant/cross-complainant and to deter future litigation." (*Id.* at p. 816.)

The Legislature designed Code of Civil Procedure section 425.16 "to provide an economical and expeditious remedy to SLAPP suits." (*Church of Scientology* v. *Wollersheim* (1996) 42 Cal.App.4th 628, 647, fn. 3 [49 Cal.Rptr.2d 620].) The first sentence of the statement of legislative purpose in subdivision (a) of Code of Civil Procedure section 425.16 identifies the problem: "The Legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." The second sentence states the legislative purpose in carefully drafted language: "The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process."

The meaning of the term "public significance" requires careful analysis. A proper understanding of the phrase is particularly critical to analysis of the

---

[2]Senate Bill No. 1264, 1991-1992 Regular Session (Stats. 1992, ch. 726, § 2.)

statute because the body of the statute contains apparently equivalent expressions. The phrase "public issue" appears in subdivision (b), the operative subdivision of the statute, and in subdivision (e), the definitional subdivision. The term "public interest" is found at the end of the same definitional subdivision.

■ In the context of Code of Civil Procedure section 425.16, these terms can best be construed from the perspective of the First Amendment freedoms the statute is designed to protect. We find an analogy in the United States Supreme Court decisions protecting the right of free expression of public employees. The threat of discharge from employment, like the threat of litigation, is of constitutional concern because it may tend to prevent or chill the exercise of constitutional rights. The leading decisions *Pickering* v. *Board of Education* (1968) 391 U.S. 563 [20 L.Ed.2d 811, 88 S.Ct. 1731] and *Connick* v. *Myers* (1983) 461 U.S. 138 [75 L.Ed.2d 708, 103 S.Ct. 1684] affirm the right of public employees to speak out on matters of public concern. The *Connick* court noted the "Constitution's special concern with threats to the right of citizens to participate in political affairs . . . . The First Amendment 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' [Citations.] '[S]peech concerning public affairs is more than self-expression; it is the essence of self-government.' [Citation.] Accordingly, the Court has frequently reaffirmed that speech on public issues occupies the ' "highest rung of the heirarchy [*sic*] of First Amendment values," ' and is entitled to special protection. [Citations.]" (*Connick* v. *Myers, supra,* 461 U.S. at p. 145 [75 L.Ed.2d at pp. 718-719]; see also *Beilenson* v. *Superior Court* (1996) 44 Cal.App.4th 944 [52 Cal.Rptr.2d 357].)

This concept of "public significance" embraces not only governmental activities but also other activities, affecting the common interest of a substantial part of the community. In a recent case construing Code of Civil Procedure section 425.16, *Church of Scientology* v. *Wollersheim, supra,* 42 Cal.App.4th at page 650, the court observed, "Although matters of public interest include legislative and governmental activities, they may also include activities that involve private persons and entities, especially when a large, powerful organization may impact the lives of many individuals. Examples are product liability suits, real estate or investment scams, etc. [Citation.]" The court found the practices of the Church of Scientology, which implicated fundamental constitutional rights, to be matters of public interest "as evidenced by media coverage and the extent of the Church's membership and assets." (*Id.* at p. 651.)

Media coverage cannot by itself, however, create an issue of public interest within the statutory meaning. If that were the case, " ' "[t]he more

sensational and hence injurious a statement"'" might be, the more public interest it would generate. (*Carney* v. *Santa Cruz Women Against Rape* (1990) 221 Cal.App.3d 1009, 1020 [271 Cal.Rptr. 30]; cf. *Brown* v. *Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 752-753 [257 Cal.Rptr. 708, 771 P.2d 406].) We construe the term rather as referring to matters occupying "the highest rung of the heirarchy [*sic*] of First Amendment values," that is, to speech pertaining to the exercise of democratic self-government.

The statement of legislative purpose mentions two of the First Amendment rights: "the constitutional rights of freedom of speech and petition for the redress of grievances."[3] Similarly, the body of the statute refers repeatedly to the same freedoms but connects them with an "or": the "right of petition or free speech." The Legislature's selection of these two particular First Amendment freedoms is, in our view, highly relevant to an understanding of the legislative purpose.

■ It is well established that "[t]he right of access to the courts is an aspect of the First Amendment right to petition the government for redress of grievances. [Citations.]" (*Church of Scientology* v. *Wollersheim, supra*, 42 Cal.App.4th at p. 647; see also *Pacific Gas & Electric Co.* v. *Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1133 [270 Cal.Rptr. 1, 791 P.2d 587].) But apart from such judicial petitions, the right of petition refers more generally to "[t]he right of the people to inform their representatives in government of their desires with respect to the passage or enforcement of laws . . . ." (*Eastern R. Conf.* v. *Noerr Motors* (1961) 365 U.S. 127, 139 [5 L.Ed.2d 464, 472, 81 S.Ct. 523].) As a guarantee of "the ability of the people to make their wishes known to their representatives" (*id.* at p. 137 [5 L.Ed.2d at p. 471]), the petition clause overlaps a broad area also protected by the right of freedom of speech;[4] it "includes acts designed to influence public opinion concerning an issue before a legislative or administrative body. . ." (*Wilcox* v. *Superior Court, supra*, 27 Cal.App.4th at p. 822), and it has been described as "an assurance of a particular freedom of expression." (*McDonald* v. *Smith* (1985) 472 U.S. 479, 482 [86 L.Ed.2d 384, 388, 105 S.Ct. 2787].) In this general sense, the right of petition embraces such activities as complaint letters to government agencies (*Smith* v. *Silvey* (1983) 149 Cal.App.3d 400, 406 [197 Cal.Rptr. 15]), testimony before government agencies (*Ludwig* v. *Superior Court* (1995) 37 Cal.App.4th 8, 17 [43 Cal.Rptr.2d 350]), publicity campaigns (*Eastern R. Conf.* v. *Noerr Motors*,

---

[3]United States Constitution, First Amendment; California Constitution, article I, sections 2 and 3.

[4]The right to petition may also occasionally implicate the right of assembly (*Mine Workers* v. *Illinois Bar Assn.* (1967) 389 U.S. 217 [19 L.Ed.2d 426, 88 S.Ct. 353]) and the right of free press (*Eastern R. Conf.* v. *Noerr Motors, supra*, 365 U.S. 127 [publicity campaign]), but the area of overlap is less notable.

*supra*, 365 U.S. 127, 137-139 [5 L.Ed.2d 464, 470-472]), boycotts (*NAACP v. Claiborne Hardware Co.* (1982) 458 U.S. 886, 914 [73 L.Ed.2d 1215, 1236-1237, 102 S.Ct. 3409]), and other forms of protest (*Brown* v. *Louisiana* (1966) 383 U.S. 131, 141-142 [15 L.Ed.2d 637, 644-646, 86 S.Ct. 719]).

There is a paucity of precedents dealing directly with the right of petition (7 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 142, pp. 199-200) which contrasts with the voluminous decisional law on freedom of speech. Indeed, the courts sometimes display a tendency "to collapse the right to petition into the right to free expression" (Notes, *A Petition Clause Analysis of Suits Against the Government: Implications for Rule 11 Sanctions* (1993) 106 Harv. L.Rev. 1111, 1113) and even to limit the right to petition to the parameters set by precedents in the field of freedom of speech. (See, e.g., *Day* v. *South Park Independent School Dist.* (5th Cir. 1985) 768 F.2d 696, 701-702.)

In short, the right of freedom of speech provides an alternative—and more commonly employed—analysis for a broad area of activity covered also by the right of petition. The statutory use of both the conjunctive "and" and the disjunctive "or" in associating the two rights is consistent with their relationship as cognate rights, sharing a large area of overlap and often offering alternative modes of analysis for the same constitutional protections.

B. *Legislative History*

The legislative history provides further clarity to the statement of legislative purpose.[5] Without exception, the documents in the chaptered bill file all refer to "the empirical research of the two University of Denver professors," in effect incorporating the scholarship of Canan and Pring into the legislative history.[6] In addition, the report prepared by the Senate Committee on the Judiciary describes five examples of SLAPP suits, and the report of the

---

[5]In our analysis of legislative history, we take notice of the following documents: (1) letter dated August 21, 1992, by the bill's sponsor, Senator Bill Lockyer, to Governor Pete Wilson asking for favorable consideration of Senate Bill No. 1264; (2) Assembly Floor Notes for Senate Bill No. 1264, (3) Assembly Committee Notes for Senate Bill No. 1264; (4) Senate Committee on the Judiciary (Feb. 25, 1992), Analysis of Senate Bill No. 1264 (1991-1992 Reg. Sess.), and (5) report by the Assembly Committee on the Judiciary dated June 30, 1992, on Senate Bill No. 1264 (1991-1992 Reg. Sess.) as amended March 26, 1992, to the Assembly Subcommittee on the Administration of Justice.

[6]See, for example, Canan and Pring, *Strategic Lawsuits Against Public Participation* (1988) 35 Soc. Probs. 506; Canan and Pring, *Studying Strategic Lawsuits Against Public Participation: Mixing Quantitative and Qualitative Approaches* (1988) 22 Law & Soc'y. Rev. 385; Pring, *SLAPPs: Strategic Lawsuits Against Public Participation* (1989) 7 Pace Envtl. L.Rev. 3;

Assembly Committee on Judiciary (June 30, 1992) on Senate Bill No. 1264 to the Assembly Subcommittee on the Administration of Justice discusses at some length a now depublished decision, *Monia v. Parnas Corp.* (Cal.App.) (opinion (H006155) deleted upon direction of Supreme Court by order dated June 20, 1991). (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1264 (1991-1992 Reg. Sess.) p. 5.)

The Legislature's concerns, as revealed by the legislative history, invariably involved activities violating the right of petition. The research of Canan and Pring is in fact based on an operational definition of SLAPP suits as implicating "behavior protected by the Petition Clause."[7] Pring describes SLAPP suits as "counter-attack[s] against petition-clause-protected activity."[8] Three of the five examples of SLAPP suits cited by the Senate Committee on the Judiciary involved expressive activity protected by both the right of petition and the right of freedom of speech. The other two examples cited by the Senate Committee on the Judiciary involve retaliation against lawsuits, i.e. judicial petitions. (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1264 (1991-1992 Reg. Sess.) p. 4.)

The *Monia* decision also involved interference with the right of petition. Though it may no longer be cited as legal authority, the facts of the case are relevant to the extent that they provide insight into the legislative intent. The case exemplifies the paradigmatic SLAPP suit described in the *Wilcox* decision. In 1980, a local ballot measure in Saratoga, California, proposed restrictions on hillside development that threatened the interests of a developer, Parnas Corporation. Proponents of the measure distributed a flier that alluded to civil and criminal proceedings against the mayor of Fremont, California, arising from his dealings with Parnas. The flier stated, "Developers such as Parnas Co., that [were] involved in the Fremont Mayor's conflict of interest, are now developing land in Saratoga's hills. . . ." In retaliation, Parnas brought a libel action against the three organizations listed at the bottom of the flier and an officer of each, including Victor Monia, the president of a citizen's group. The trial court found that Parnas used the libel

Canan, *The SLAPP from a Sociological Perspective* (1989) 7 Pace Envtl. L.Rev. 23; Canan et al., *Using Law Ideologically: The Conflict Between Economic and Political Liberty* (1992) 8 J.L. & Pol. 539.

[7] Canan and Pring, *Studying Strategic Lawsuits Against Public Participation: Mixing Quantitative and Qualitative Approaches, supra,* 22 Law & Soc'y. Rev. at page 387.

[8] Pring, *SLAPPs: Strategic Lawsuits Against Public Participation, supra,* 7 Pace Envtl. L.Rev. at page 12.

litigation "to chill its opponents' political activity, an aim repugnant to the ideals of American democracy."[9]

In sum, the legislative history emphasizes the legislative intent to safeguard activities protected by the petition clause with a particularly clear focus on expressive conduct for which the right of freedom of speech offers an alternative protection. The statute represents a clear recognition of the need to provide maximum protection of a citizen's right to exercise free speech and petition where such rights are exercised in relation to issues of public concern.

## C.  Statutory Scope

Subdivision (b) of Code of Civil Procedure section 425.16 provides for the operative remedy: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." The critical language in subdivision (b) is defined in subdivision (e) in terms of three definitions, introduced by the word "includes," which we will identify by numbers enclosed with brackets: "(e) As used in this section, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes [1] any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; [2] any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; or [3] any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest."

We read phrases [1] and [3] as having narrow applications. Phrase [1] presents few problems of interpretation. The term "before" requires that the statement or writing be submitted to, or presented in, the proceedings at issue. The provision falls clearly within the scope of the right of petition and generally parallels the statutory privilege established by Civil Code section 47, subdivision (b).

Phrase [3] contains the potentially elastic term "public forum," but, like the term "public significance," it can most reasonably be construed in the

---

[9]See report by the Assembly Committee on Judiciary dated June 30, 1992, on Senate Bill No. 1264 (1991-1992 Reg. Sess.) as amended Mar. 26, 1992, to Assembly Subcommittee on the Administration of Justice, supra, page 5.

sense found in First Amendment jurisprudence. This analysis leads to a narrow definition of the term which strictly limits the scope of phrase [3]. "The term 'public forum,' which originated in a dissenting opinion by Justice Douglas in *Adderley* v. *Florida* (1966) 385 U.S. 39 [17 L.Ed.2d 149, 87 S.Ct. 242], refers typically to those places historically associated with First Amendment activities, such as streets, sidewalks, and parks." (*Prisoners Union* v. *Department of Corrections* (1982) 135 Cal.App.3d 930, 934-935 [185 Cal.Rptr. 634].) In the words of a seminal law review article, "in an open democratic society the streets, the parks, and other public places are an important facility for public discussion and political process. They are in brief a public forum that the citizen can commandeer; the generosity and empathy with which such facilities are made available is an index of freedom." (Kalven, *The Concept of the Public Forum: Cox* v. *Louisiana,* (1965) Sup. Ct. Rev. 1, 11-12.)

The courts have extended the concept to other facilities, open to the public for certain limited purposes, where free expression may be regulated to the extent that it is " 'incompatible with the normal activity of a particular place at a particular time.' [Citations.]" (*United States* v. *Douglass* (9th Cir. 1978) 579 F.2d 545, 548-549.) Thus, in libraries and schools, " 'the government has the power to limit speech to maintain the order required to carry on the purpose of those institutions. Least shielded from regulation are public institutions which do not perform speech-related functions at all—such as hospitals, jails or military bases.' " (*Prisoners Union* v. *Department of Corrections, supra,* 135 Cal.App.3d at p. 935.) In *U.C. Nuclear Weapons Labs Conversion Project* v. *Lawrence Livermore Laboratory* (1984) 154 Cal.App.3d 1157, 1164 [201 Cal.Rptr. 837], the court described the concept of a public forum as "a continuum, with public streets and parks at one end and government institutions like hospitals and prisons at the other." (See also *Hazelwood School District* v. *Kuhlmeier* (1988) 484 U.S. 260, 267 [98 L.Ed.2d 592, 602-603, 108 S.Ct. 562]; *Leeb* v. *DeLong* (1988) 198 Cal.App.3d 47, 56 [243 Cal.Rptr. 494].)

As the court observed in *Lafayette Morehouse, Inc.* v. *Chronicle Publishing Co.* (1995) 37 Cal.App.4th 855, 863, footnote 5 [44 Cal.Rptr.2d 46] (hereafter *Lafayette Morehouse*), private newspaper publishing falls outside of this concept of a public forum: "No authorities have been cited to us holding a newspaper printing allegedly libelous material is a 'place open to the public or a public forum.' Newspaper editors or publishers customarily retain the final authority on what their newspapers will publish in letters to the editor, editorial pages, and even news articles, resulting at best in a controlled forum not an uninhibited 'public forum.' "

A "public forum" in this restricted sense may be the stage for both petition-clause-protected activity[10] and other forms of free expression. Phrase [3], however, is limited to the use of a public forum "in connection with a public issue"—a qualification that will often, but not always, draw the provision within the ambit of the petition clause. (See *Matson* v. *Dvorak* (1995) 40 Cal.App.4th 539 [46 Cal.Rptr.2d 880].)

■ Phrase [2] has been the primary focus of litigation over the scope of Code of Civil Procedure section 425.16 and presents difficult questions of interpretation. Since it is introduced by the word "includes," the three-part definition in subdivision (e) exemplifies aspects of the language subject to definition without nullifying any of the operative expressions. Thus, even though phrase [2] contains no reference to "public issue" or an equivalent phrase, we do not think it eliminates the requirement, expressed in the language subject to definition, that the oral statement or writing must be "in connection with a public issue."[11] The operative language in subdivision (b), partially exemplified by phrase [2], continues to require that the issue in question, i.e. "an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law," be a public issue.

Even with this qualification, the language of phrase [2] is difficult to construe in the context of the expressed legislative purpose. To interpret the provision, one must work through three layers of language—the definition itself, the language subject to definition, and the statement of legislative purpose. Our analysis leads us to conclude, however, that the statute was intended to apply, and in fact can most reasonably be construed as applying, to the narrow sphere of activity, described in the statement of legislative purpose, involving the exercise of a citizen's rights under the petition clause and related areas protected by the right of freedom of speech.

A narrow interpretation of phrase [2] is consistent with three of the decisions that have considered the provision.[12] In *Wilcox* v. *Superior Court*, *supra*, 27 Cal.App.4th 809, a court reporter distributed a memo to other court reporters informing them of a lawsuit against an association of court reporters and soliciting their financial support for the litigation. The court found

[10]It is perhaps significant that, like some other SLAPP suits, the *Monia* case involved the distribution of fliers in a public area—an activity involving the use of a "public forum" in the most traditional sense.

[11]In this minor respect, we disagree with the excellent opinion in *Church of Scientology* v. *Wollersheim*, *supra*, 42 Cal.App.4th at page 650.

[12]Though we do not wish to rely on *Ludwig* v. *Superior Court*, *supra*, 37 Cal.App.4th 8, it is not inconsistent with our holding in this appeal. The decision has been criticized on the ground that it failed to limit the statute to "written or oral statements or writings" within the

that the statements in the memo were "clearly made in connection with the underlying judicial challenge to direct contracting. . . . [T]hose statements were made in the context of exhorting shorthand reporters to contribute to the cost of pursing that litigation. Thus, there is a strong showing those statements are rationally connected to the litigation itself." (*Id.* at pp. 821-822.)[13] In *Dixon* v. *Superior Court* (1994) 30 Cal.App.4th 733, 743 [36 Cal.Rptr.2d 687], the court found that allegedly defamatory letters written by an archaeology professor to university officials criticizing an archaeological consultant were made in connection with the public review of a proposed negative declaration under the California Environmental Quality Act. In *Church of Scientology* v. *Wollersheim, supra,* 42 Cal.App.4th 628, the defendant obtained a large tort judgment against the Church of Scientology after 15 years of litigation. The Church responded by filing a suit to void the judgment on the ground of judicial bias in the conduct of the trial. The court observed that "[t]he right of access to the courts is an aspect of the First Amendment right to petition the government for redress of grievances. [Citations.]" (*Id.* at p. 647.) Therefore, the court held that the suit attacking the prior judgment constituted a "cause of action against a person 'arising from any act of that person in furtherance of the person's right to petition'" as this language is defined in phrase [2] of Code of Civil Procedure section 425.16, subdivision (e). (42 Cal.App.4th at p. 647.)

A narrow interpretation, however, conflicts with the conclusion reached in *Averill* v. *Superior Court* (1996) 42 Cal.App.4th 1170 [50 Cal.Rptr.2d 62]. There, a charitable corporation, Eli Home, sought a permit from the Anaheim Planning Commission and City Council to establish a home for battered women. When the plan aroused vehement opposition in the neighborhood, Eli Home countered by bringing an action for slander against several homeowners who opposed issuance of the permit. The cause of action against Averill was based exclusively on her efforts to persuade her employer, Rockwell International, to terminate charitable contributions to Eli Homes. Holding that the statute applied to private communications, the court stated, "[W]e conclude the Legislature intended the statute to have broad application." (*Id.* at p. 1176.)

We do not agree with the statement in *Averill* that the statute was meant to have broad application. We conclude rather that the Legislature intended the

---

meaning of subdivision (e). (Stokes, *The SLAPP Statute: A Three-Year Retrospective on a Constitutional Experiment* (Cont.Ed.Bar 1996) 17 Civ. Litigation Rptr. 411, 415.)

*Evans* v. *Unkow* (1995) 38 Cal.App.4th 1490 [45 Cal.Rptr.2d 624] does not address the issue of the scope of Code of Civil Procedure section 425.16. *Robertson* v. *Rodriguez* (1995) 36 Cal.App.4th 347 [42 Cal.Rptr.2d 464] considers only whether the statute applies to causes of action which accrued before its effective date.

[13]We express no opinion as to whether the court correctly applied Code of Civil Procedure section 425.16, subdivision (e) to a claim of restraint of trade through a threatened boycott.

statute to be governed by the restricted scope of the statement of legislative purpose in Code of Civil Procedure section 425.16, subdivision (a). The very fact that the Legislature included a precisely drafted statement of legislative purpose in the statute manifests an intent that the application of the statute be governed by this statement of purpose. We see, in addition, two further reasons to restrict the application of the statute to a limited sphere of activities.

First, we see significance in the fact that Code of Civil Procedure section 425.16 mentions only two of the rights found in the First Amendment. Apart from freedom of religion, the Amendment guarantees freedom of speech, freedom of the press, the right of assembly and the right to petition; section 425.16 refers only to freedom of speech and the right to petition. SLAPP suits described by the statement of legislative purposes are closely tied to the right to petition and the cognate protections of the right of freedom of speech. The reference to these two rights, with no mention of other rights enumerated in the First Amendment, suggests that the Legislature contemplated that the statute would apply only to a limited sphere of activities covered by certain protections of the First Amendment, i.e. activities described by the statement of legislative purpose.

Second, constitutional considerations indicate that the Legislature never contemplated that the statute would apply "broadly" to First Amendment rights. An important strand of due process doctrine guarantees meaningful access to judicial protection. (Tribe, American Constitutional Law (2d ed. 1988) § 10-18, pp. 753-760.) The right of access to the courts may be compromised if a defendant is deprived of the opportunity to conduct the discovery necessary to prove his or her case. Defamation actions requiring proof of malice can ordinarily be proven only through discovery since malice pertains to the defendant's state of mind. By quickly filing a motion to strike under Code of Civil Procedure section 425.16, discovery proceedings are suspended under subdivision (g), and a defendant may effectively deprive the plaintiff of the opportunity to engage in discovery that he or she needs to defend against the motion.[14]

As the court in *Lafayette Morehouse, supra*, 37 Cal.App.4th 855[15] noted, the constitutional dilemma can be obviated by a liberal policy of ordering

---

[14]Subdivision (b) of Code of Civil Procedure section 425.16, requires that "the plaintiff must demonstrate the complaint is legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." (*Wilcox* v. *Superior Court, supra*, 27 Cal.App.4th at p. 823.) The factual showing must be based on admissible evidence (*id.* at p. 830) and may not rely on "[a]n averment on information and belief." (*Evans* v. *Unkow, supra*, 38 Cal.App.4th at pp. 1497-1498.)

[15]We do not express an opinion as to whether or not the decision of our colleagues in Division Five is consistent with our interpretation of Code of Civil Procedure section

continuances and allowing further discovery under subdivision (g). In its opinion, the trial court should "liberally exercise its discretion by authorizing reasonable and specified discovery timely petitioned for by a plaintiff in a case such as this, when evidence to establish a prima facie case is reasonably shown to be held, or known, by the defendant or its agents and employees." (*Lafayette Morehouse, supra*, 37 Cal.App.4th at p. 868.)[16] The court should also continue "the hearing to a later date so that the discovery it authorized can be completed where a reasonable exercise of judicial discretion dictates the necessity therefor. So construed, the statute does not violate a plaintiff's right to due process of law . . . ." (*Ibid.*)

The apparent failure to address this constitutional dilemma can be explained by the legislative history of the section. The paradigmatic SLAPP lawsuit, as exemplified by the *Monia* case and the five examples given in the report by the Senate Committee on the Judiciary (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1264 (1991-1992 Reg. Sess.) p. 4.), does not involve the issue of proof of malice. The Legislature, in our view, never intended that the statute would apply "broadly" to defamation actions. If it had acted on such an intent, we would expect to find some statutory recognition of this constitutional dilemma.[17]

D. *Failure to Make the Required Prima Facie Showing*

In view of the stated legislative intent and history of Code of Civil Procedure section 425.16 and our interpretation of its provisions, we turn now to its application to the facts before the trial court. The first decision to construe Code of Civil Procedure section 425.16, *Wilcox* v. *Superior Court, supra*, 27 Cal.App.4th 809, 820, established the principle that the moving party bears the initial burden of making a prima facie showing that the plaintiff's cause of action arises " 'from any act of [defendant] in furtherance

---

425.16. The factual context presented in *Lafayette Morehouse* is entirely different from the facts before us.

[16]See also *Wilcox* v. *Superior Court, supra*, 27 Cal.App.4th at page 823 ("In order to satisfy due process, the burden placed on the plaintiff must be compatible with the early stage at which the motion is brought and heard (§ 425.16, subds. (f) and (g)) and the limited opportunity to conduct discovery (subd. (g))."). (Cited in *Church of Scientology* v. *Wollersheim, supra*, 42 Cal.App.4th at p. 654.) In *Robertson* v. *Rodriguez, supra*, 36 Cal.App.4th 347, 357, the court held that the plaintiff could not raise a due process objection because he did not move for a continuance to conduct more discovery.

[17]While our interpretation of Code of Civil Procedure section 425.16 may minimize constitutional difficulties involved in proof of malice, it does not eliminate them. The statute may properly apply to suits by officeholders, entitled to the protection of *New York Times* v. *Sullivan* (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412], who are aggrieved by alleged defamatory statements. (E.g., *Evans* v. *Unkow, supra*, 38 Cal.App.4th at pp. 1497-1499; *Robertson* v. *Rodriguez, supra*, 36 Cal.App.4th 347.)

of [defendant's] right of petition or free speech under the United States or California Constitution in connection with a public issue.' [Citation.]" We hold that the defendant here failed to carry his burden of making this initial prima facie showing.

We look to the three-part definition in Code of Civil Procedure section 425.16, subdivision (e) which explicates the operative language of subdivision (b). Phrase [1] of subdivision (e) plainly cannot apply to the present case since the communications at issue to the reporter and father were not made "before a legislative, executive, or judicial proceeding, or any other official proceeding . . . ." Phrase [3] also cannot apply because the statements were not made "in a place open to the public or a public forum" but rather were made in a private setting to a reporter. As noted in *Lafayette Morehouse, supra,* 37 Cal.App.4th 855, 863, footnote 5, a private newspaper is not a public forum.

With respect to phrase [2], the defendant offers vague allegations seeking to link the reporter's interview with the will contest and the coroner's investigation. For example, the defendant's declaration states: "The statements I have made in the past to Mr. Dorgan, the reporter for the San Jose Mercury News, and to various officials who were looking into the matter of my brother's death and to others were all made by me in an effort to aid my father's will contest litigation and, more importantly, flowed from my desire that the investigation into my brother's death be continued to some meaningful conclusion."

Defendant appears to reason that the press interview was "in connection with an issue under consideration or review by a . . . judicial body" because it pertained to a pending will contest. But as we have noted, phrase [2] partially exemplifies the language subject to definition without eliminating the requirement that the statement or writing be "in connection with a public issue." It cannot be seriously contended that every comment on a lawsuit involves a public issue. If that were the case, any statement pertaining to a dispute would come within the statute once a related lawsuit has been filed. Though lawsuits may sometimes relate to a public issue, the mere fact that a lawsuit was pending has no significance in determining the existence of a public issue. Moreover, the question whether the statements concerned a matter of public interest cannot be determined on the basis of media coverage, notoriety or potential newsworthiness. It would be absurd to suppose that a newspaper can generate a public issue by the mere fact of printing a story, even when it expects lively interest among its readers. If that were the case, a newspaper could bring itself, and others, within the statute by its own decision to cover a controversy even if the public has no interest in it.

The existence of a public issue depends rather on whether the statements possessed the sort of relevance to self-government that places them in a specially protected category of First Amendment values described in *Connick* v. *Myers, supra*, 461 U.S. at p. 145 [75 L.Ed.2d at pp. 718-719]. Though the unusual and intriguing circumstances surrounding Tai-Kin Wong's death and the discovery of a purported holographic will may have been newsworthy, they did not involve a "public issue" in the sense that we interpret the term.

We note also that the interview did not have a relation to the petition clause which would bring it within the legislative purpose of the statute. The vague allegations of the declaration leave us to infer that the interview occurred at about the time the will contest was concluded in the trial court. We know that a notice of appeal was filed on March 17, 1994, that Dorgan's interview occurred in February or March, and that the story was published on August 21, 1994. This sequence of events makes it implausible to suppose that the interview was intended to influence the outcome of the will contest. More importantly, defendant was not himself a party to the will contest; and even if he wished to influence the litigation to protect his inheritance, it is dubious that an interview with a local newspaper reporter could be regarded as the sort of trial tactic entitled to protection under the right of petition.

The alleged link with the coroner's investigation is more plausible. The declaration states (1) that in a report dated February 26, 1993, the investigator for the Alameda County Coroner concluded that the cause of death could not be determined, (2) that the City of Fremont Police Department had not conducted a "full blown" murder investigation, and (3) that Daniel Wong had "spoken to various public officials, including representatives of the Alameda County Coroner's Office and Fremont City Police Department." The declaration, however, suffers from vagueness. We do not know exactly what statements were made to law enforcement agencies or when they were made. The story was published and the complaint was served about one and one-half years after the date of coroner's report attached to defendant's declaration. Though defendant may have made some contacts with public officials, they may well have occurred so long before the filing and service of the complaint, that any connection between the two is implausible. In short, we lack detailed information that would clearly support the inference that the press interview formed part of an effort to influence official action.

We regard plaintiff's cause of action based on the press interview as involving typical allegations of slander per se with tenuous and speculative links with the petition clause. Under the broad interpretation of Code of

Civil Procedure section 425.16 advocated by the *Averill* court, it might perhaps be thought to come within the statute. We read the statute, however, as providing an extraordinary remedy for a narrowly defined category of litigation. It is consistent with this legislative intent to require the moving party to show facts from which the court can reasonably conclude that the statements at issue were made in the exercise of the right to participate freely in the public process without the threat of litigation. We find that the defendant fell short of making a sufficient showing to bring the case within the scope of the statute. If the complaint is frivolous, as defendant maintains,[18] it should be attacked through a motion for summary judgment in the same manner as other meritless defamation actions.

The second cause of action based on alleged statements to the defendant's father presents separate issues which can be readily disposed of. The statements to the father obviously had no connection with the coroner's investigation but they could conceivably have some link with the initiation of the will contest. The defendant's declaration, however, states only that he has "actively encouraged and supported [his] father in connection with the will contest litigation." We do not think this vague allegation suffices to show that the plaintiff's cause of action arises from the defendant's exercise of his First Amendment rights.

We conclude that defendant Daniel Wong did not meet his burden of showing that the suit falls within the class of suits subject to Code of Civil Procedure section 425.16. (*Wilcox* v. *Superior Court*, *supra*, 27 Cal.App.4th at p. 819; *Church of Scientology* v. *Wollersheim*, *supra*, 42 Cal.App.4th at p. 646.)

### DISPOSITION

The judgment and order awarding costs are reversed. Plaintiff to recover costs on appeal.

Strankman, P. J., and Stein, J., concurred.

Respondent's petition for review by the Supreme Court was denied November 13, 1996. Kennard, J., was of the opinion that the petition should be granted.

---

[18]Defendant's declaration states: "At no time during my interview with Mr. Dorgan or at any other time that I can recall, have I ever made any accusation against Xi Zhao, nor have I ever made the statement that she was guilty of murder or forgery."